THE STATE OF OHIO, APPELLEE, *v.* MCKNIGHT, APPELLANT.

[Cite as *State v. McKnight,* 107 Ohio St.3d 101, 2005-Ohio-6046.]

(No. 2002–2130—Submitted March 29, 2005—Decided November 30, 2005.)

ALICE ROBIE RESNICK, J.

{¶ 1} Gregory McKnight, defendant-appellant, was convicted of the murder of Gregory Julious and the aggravated murder of Emily Murray and was sentenced to death. In this appeal, appellant raises 30 propositions of law. We find that none of his propositions of law have merit and affirm appellant's convictions. We have also independently weighed the aggravating circumstances against the mitigating factors and have compared appellant's sentence of death to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm appellant's sentence of death.

*State's Case*

{¶ 2} During early 2000, Julious lived with his girlfriend, Dana Bostic, at her home in Chillicothe. At the time, appellant was dating Lisa Perkins, who was a friend of Bostic's. Appellant became acquainted with Julious by visiting Perkins at Bostic's home.

{¶ 3} On Friday, May 12, 2000, at around 4:00 p.m., Bostic returned home from work and found appellant, Julious, and her daughter in the kitchen. Julious was wearing only boxer shorts. Bostic then left the house with her daughter to pick up her son.

{¶ 4} When Bostic returned after approximately one hour, appellant and Julious were no longer at the house. Bostic testified, "The door was unlocked. There was candles still burning, * * * and it was like he just ran out for a minute and he was coming right back." Moreover, Julious's belongings, including his clothes, personal hygiene products, and his identification card, were still in the house.

{¶ 5} When Julious did not return home, Bostic called appellant on his pager. Later that night, appellant returned Bostic's call and put Julious on the phone. Julious told Bostic that "he was in Columbus at McKnight's friend's house and they were getting ready to go to a OSU block party and he would be home." Bostic described the conversation as "very unusual" because Julious "didn't let

[her] ask him anything else" and abruptly ended the conversation. Bostic never saw or talked to Julious again.

{¶ 6} In June 2000, appellant and his wife, Kathy McKnight, acquired a trailer in a rural area near Ray, Ohio. Appellant and Kathy moved their belongings into the trailer, but they did not move in. Instead, they moved to the home of Kathy's mother, in Gambier.

{¶ 7} In late September or early October 2000, appellant was hired as a kitchen worker at the Pirate's Cove restaurant in Gambier. Appellant was friendly with his co-workers, and they would sometimes give him rides to his Gambier home after work.

{¶ 8} Emily Murray, a Kenyon College student, was a part-time waitress at the Pirate's Cove. Murray lived in a Kenyon College dormitory approximately 100 yards from the Pirate's Cove, and she drove her mother's Subaru Outback at Kenyon.

{¶ 9} On November 2, 2000, Murray quit her job and spent her last evening working at the Pirate's Cove. Several college friends visited Murray at the Pirate's Cove to help celebrate her last night at work, but her friends left before Murray finished work.

{¶ 10} Appellant also worked at the Pirate's Cove on the evening of November 2. Time cards showed that Murray finished work at 3:07 a.m. and appellant finished work at 2:59 a.m. on November 3. Nathan Justice, the bartender at the Pirate's Cove, saw Murray looking for her keys before 3:30 a.m. No one at the Pirate's Cove recalls seeing Murray and appellant leave together.

{¶ 11} Murray never returned to sleep in her dormitory room, and she failed to appear at a party on the evening of November 3. This absence concerned Murray's friends because Murray had not left a message regarding her whereabouts and they could not find Murray's Subaru Outback on campus or in Gambier.

{¶ 12} After an unsuccessful search for Murray, her friends notified Murray's family and Kenyon College Security. A search of Murray's dormitory room by Murray's friend, Abigail Williams, produced Murray's wallet, which contained her Ohio and New York driver's licenses, credit cards, and bank card.

{¶ 13} On Sunday evening, November 5, Williams talked to appellant about Murray's disappearance. Appellant said that he had worked that night but "left well before she did * * * [and] that he was not there so he could see her leave." According to Williams, appellant was "very curt" and "[they] didn't get any information. He just kind of smirked" at them. A short time after Murray disappeared, appellant told Nate Justice that "[h]e felt that [Murray] was probably dead."

{¶ 14} On December 9, 2000, Vinton County Sheriff's Chief Deputy Charles Boyer and Deputy Matt Kight went to appellant's trailer to serve an unrelated indictment on him, but appellant was not there. Deputy Kight ran a license check on a vehicle on the property and learned that the Subaru Outback parked behind the trailer was associated with the disappearance of Emily Murray.

{¶ 15} After obtaining a search warrant, law enforcement entered appellant's trailer and found bloodstains on the carpet near the front door. Police followed a trail of blood down the hallway and discovered Murray's clothed body wrapped inside a carpet in the spare bedroom.

{¶ 16} During the search, Special Agent Gary Wilgus, a crime-scene investigator with the Ohio Bureau of Criminal Identification and Investigation, found a copper bullet jacket near the bloodstained carpet in the living room. A bullet hole was found in the area of the bloodstained carpet, but investigators did not find the bullet that went through the floor. Additionally, police found five spent .357 shell casings inside a drawer in the living room, seven nine-millimeter bullets inside a drawer in the master bedroom, and a roll of bloodstained duct tape in the living room.

{¶ 17} Investigators searching the property found human bones and clothing in the cistern, the root cellar, and in a plastic bag. Police discovered that a fire had been started in the root cellar, and they recovered burned bones and pieces of clothing. The skeletal remains included most of the bones from a single human, but only six skull fragments were found. Dr. Nancy Tatarek, a forensic anthropologist, concluded that the remains were from an African–American male who was 20 to 25 years of age and six feet to six feet, six inches tall.

{¶ 18} The police identified the remains as those of Gregory Julious. Dr. Franklin Wright, a forensic dentist, positively matched the teeth and jaw bone found on appellant's property with Julious's dental records. Bostic also identified the remains of boxer shorts found in the cistern as those Julious was wearing the day he disappeared. Kim Zimmerman, appellant's brother-in-law, had given police a bloodstained backpack that he had taken from the trailer's living-room closet.

{¶ 19} Police searched the vehicle that appellant was driving when Julious disappeared, and they discovered bloodstains on the carpet underneath the rear seat. Subsequent DNA analysis showed that the "DNA from the * * * carpet [was] consistent with the DNA profile from Gregory L. Julious." According to Diane Larson, a DNA serology analyst, the "chance of finding the same DNA profile in the population is * * * approximately 1 in 50 trillion people for the Caucasian population, one in 177 trillion in the African–American population, and 1 in 51 trillion in the Hispanic population."

{¶ 20} Inside appellant's Gambier home, police found an empty box of Winchester .357 magnum cartridges underneath the bed in the master bedroom, two .30 caliber bullets in the master-bedroom closet, and four nine-millimeter bullets in the basement. Police also learned that appellant had purchased three handguns from two gun shops before the murders: a Jennings nine-millimeter semiautomatic pistol purchased on February 17, 1999, an Intratec nine-millimeter pistol purchased on April 24, 1999, and a Jennings .380 caliber semiautomatic pistol bought on May 24, 2000.

{¶ 21} Dr. Dorothy Dean, Deputy Coroner for Franklin County, found that Murray had died from a single "gunshot wound to the head." Murray was shot with a high-powered weapon, and the gun was "very, very close or touching her skin" when fired.

{¶ 22} Dr. Tatarek found that the condition of the skull fragments of Julious were "consistent with an injury by gunshot." She also found evidence of trauma to the vertebra "caused by some sort of sharp object penetrating the person's neck and cutting into the bone." Moreover, trauma to two hand bones was "consistent [with] defense wounds." Dr. Tatarek also found trauma around joints "consistent with dismemberment of a person." The condition of the skeletal remains placed the date of death within a three- to six-month time frame that included May 12, 2000.

{¶ 23} Diane Larson concluded that the DNA profile from the bullet jacket found in appellant's trailer was consistent with Murray's DNA profile. The odds that the DNA from the bullet jacket was from someone other than Murray were one in 646 billion for the Caucasian population. Larson also found that the bloodstains on the backpack and duct tape matched Julious's DNA profile. The odds that the DNA from bloodstains on the backpack was from someone other than Julious were one in 64 quadrillion for the African–American population.

{¶ 24} Heather Zollman, a firearms expert, compared a bullet taken from a tree behind the trailer and the bullet jacket from inside the house and concluded that they were "fired [from] the same firearm." Zollman described each as a "Remington brand 180 gram .357 magnum semi-jacketed hollow-point bullet." She could not determine the caliber of the bullet removed from Murray's body. Nevertheless, Zollman concluded that the lead was "consistent with having come from the bullet." Gunpowder on the surface of the bullet fragment was also "the same type of style of flattened ball powder that is loaded by Remington in these .357 magnum cartridges."

## Defense's Case

{¶ 25} The defense called one witness. Donald Doles, a Vinton County neighbor of appellant, testified that twice during the fall of 2000, he had observed

a woman who looked like Emily Murray drive past his house in a Subaru Outback with New York license plates. When she drove past on one occasion, Doles was only ten or 12 feet away from the car when "she turned around and looked at [him] and smiled and waved." During cross-examination, Doles did not recognize Murray's picture, and he said that he was not 100 percent certain that the woman driving past his house was Murray.

## Indictment and Trial Result

{¶ 26} The grand jury indicted appellant on one count of aggravated murder and one count of murder. Count 1 charged appellant with the aggravated murder of Murray while committing a kidnapping, Count 2 charged kidnapping, and Count 3 charged aggravated robbery. Count 6 charged appellant with the murder of Julious. Additionally, appellant was indicted for tampering with evidence in Counts 4 and 7 and gross abuse of a corpse in Counts 5 and 8. Prior to trial, Counts 4, 5, 7, and 8 were dismissed.

{¶ 27} The aggravated-murder count contained four death-penalty specifications: murder to escape detection, apprehension, trial, or punishment for another offense, pursuant to R.C. 2929.04(A)(3); murder as a "course of conduct" in killing two or more people, pursuant to R.C. 2929.04(A)(5); murder while committing or attempting to commit kidnapping, pursuant to R.C. 2929.04(A)(7); and murder while committing or attempting to commit aggravated robbery, pursuant to R.C. 2929.04(A)(7). The indictment also contained a firearm specification.

{¶ 28} Appellant pleaded not guilty to all charges. The jury found appellant guilty of Counts 1, 2, 3, and 6, and he was sentenced to death.

{¶ 29} Appellant appeals to this court as a matter of right.

## Pretrial Issues

{¶ 30} *Search warrant.* In proposition of law V, appellant argues that his trailer was illegally searched because the affidavit supporting the search warrant included false and misleading information.

{¶ 31} "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either 'intentionally, or with reckless disregard for the truth.'" *State v. Waddy* (1992), 63 Ohio St.3d 424, 441, 588 N.E.2d 819, quoting *Franks v. Delaware* (1978), 438 U.S. 154, 155–156, 98 S.Ct. 2674, 57 L.Ed.2d 667. "Reckless disregard" means that the affiant had serious doubts about the truth of an allegation. *United States v. Williams* (C.A.7, 1984), 737 F.2d 594, 602. Omissions count as a false statement if "designed to mislead, or

* * * made in reckless disregard of whether they would mislead, the magistrate." (Emphasis deleted.)  *United States v. Colkley* (C.A.4, 1990), 899 F.2d 297, 301.

{¶ 32} On December 9, 2000, Vinton County Sheriff's Deputy Matt Kight observed a Subaru Outback with New York license plates behind appellant's trailer. A police computer check connected the vehicle to Emily Murray, who was listed as a "missing endangered person."

{¶ 33} Later that afternoon, Vinton County Chief Deputy Sheriff Charles Boyer went to appellant's trailer and verified ownership of the Subaru by checking both the vehicle's license plate and the vehicle identification number ("VIN"). Boyer also learned through a Knox County police dispatcher that Murray had been missing since November 3 and that Knox County authorities "had done extensive searching, [and] had the F.B.I. involved."

{¶ 34} Boyer listed the following facts and circumstances in the affidavit to obtain a search warrant for the trailer: "Emily Sarah Murray is listed as an endangered missing person by the Knox County, Ohio Sheriff's Office, as of November 3, 2000. Earlier today while attempting to serve an indictment on Gregory McKnight at his residence, I saw a vehicle with New York license plates on it. Mr. McKnight was not at home, neither was anybody else. Prior to leaving, I ran the license plate number. It came back to Cynthia Murray with an alert for Emily Sarah Murray as an endangered and missing person. The vehicle came up missing the same time Emily did. I obtained confirmation from Knox County officials whom are traveling to Vinton County at this time."

{¶ 35} Boyer also attached to the affidavit a missing person's flyer regarding Murray's disappearance. The affidavit listed "Abduction, R.C. 2905.02; Kidnapping, R.C. 2905.01; ENDANGERED MISSING PERSON" as the provisions of law violated. Later on December 9, Judge Grillo issued the search warrant.

{¶ 36} Appellant claims that the search warrant was invalid because three false statements were included in the affidavit. First, appellant asserts that Kight, rather than Boyer, saw the Subaru behind appellant's trailer and checked the plates on the police computer. The facts do not support this allegation. After being notified that Murray's Subaru was found behind appellant's trailer, Boyer checked the VIN and license-plate number of the Subaru on the police computer in the sheriff's office. Boyer then went to appellant's trailer, checked the VIN on the Subaru, and verified the vehicle's ownership. Thus, Boyer correctly stated in the affidavit that he observed the Subaru and verified its ownership.

{¶ 37} Second, appellant contends that Boyer's affidavit falsely states that he contacted the Knox County Sheriff's Office about Murray's disappearance. We also reject this claim. Boyer's affidavit does not assert that he personally contacted Knox County officials about Murray's disappearance. The affidavit states, "I *obtained confirmation* from Knox County officials." (Emphasis added.)

This statement encompasses information that Boyer obtained about Murray's disappearance through the police dispatcher.

{¶ 38} Moreover, information about Murray's disappearance obtained through the police dispatcher was properly included in the affidavit. Courts have recognized that " 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.' " *Maumee v. Weisner* (1999), 87 Ohio St.3d 295, 297, 720 N.E.2d 507, quoting *United States v. Hensley* (1985), 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604.

{¶ 39} Third, appellant argues that the affidavit improperly listed kidnapping and abduction as the violated laws because Murray was listed only as a missing and endangered person at that point.

{¶ 40} Crim.R. 41(C) provides that a search-warrant affidavit "shall name or describe the person to be searched or particularly describe the place to be searched * * * [and] *state substantially the offense* in relation thereto, and state the factual basis for the affiant's belief that such property is there located." (Emphasis added.) See, also, R.C. 2933.23. "Crim.R. 41(C) requires a substantial statement of the offense in relation to the property to be seized and *not the specific code number or title of that offense.*" (Emphasis added.) *Cleveland v. Becvar* (1989), 63 Ohio App.3d 163, 166, 578 N.E.2d 489. Moreover, the "failure to specify the offense to which the evidence is related by name or code section in the affidavit is not constitutionally significant" and does not require suppression of evidence seized pursuant to that warrant. Id.

{¶ 41} Probable cause to search does not require proof that a crime was actually committed, merely the fair probability that evidence of a crime will be found at the location described. *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph one of the syllabus. The facts in the affidavit fully supported a finding of probable cause: Murray had been missing for over a month and was considered a missing and endangered person; Murray and her car had disappeared at the same time from Knox County; police then discovered her car behind appellant's trailer in an isolated part of Vinton County. Based upon these facts, the affidavit properly listed kidnapping and abduction as possible offenses, and that listing did not constitute a false and misleading statement in violation of *Franks v. Delaware,* 438 U.S. at 170, 98 S.Ct. 2674, 57 L.Ed.2d 667.

{¶ 42} Based on the foregoing, proposition V is overruled.

{¶ 43} *Dismissal of the capital specifications.* In proposition of law VII, appellant argues that the trial court erred in reinstating the capital specifications.

{¶ 44} In a pretrial motion dated February 7, 2002, appellant's trial counsel sought to dismiss the capital specifications due to asserted constitutional- and international-law violations. On August 8, 2002, the trial court dismissed the capital specifications, finding "that the potential impact of financial considerations could compromise the Defendant's due process rights in a capital murder trial."

{¶ 45} In an August 14, 2002 motion for reconsideration, the state argued that the trial court improperly usurped the state's authority to prosecute a capital case, that none of appellant's requests for funding had been denied, and that adequate funding was available to prosecute this capital case. On August 23, 2002, the trial court vacated its earlier ruling. The court later held that "its concern as to financial impact was based upon prospective due process considerations, rather than any actual deprivation of due process." On September 19, 2002, the trial court held that its August 8, 2002 dismissal was "void ab initio."

{¶ 46} Appellant argues that the trial court erred in reinstating the capital specifications. First, appellant argues that the trial court properly exercised its discretion by dismissing the capital specifications to avoid the risk of imposing an unreliable and arbitrary death sentence and thus erred by reinstating the capital specifications.

{¶ 47} However, "[t]he grand jury is the ultimate charging body, and it is within its discretion, based on the evidence presented to it, to determine for which felony an accused shall be charged." *Foston v. Maxwell* (1964), 177 Ohio St. 74, 76, 29 O.O.2d 194, 202 N.E.2d 425. "Consequently, the decision whether to prosecute is discretionary and not normally subject to judicial review." *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197; *State ex rel. Master v. Cleveland* (1996), 75 Ohio St.3d 23, 27, 661 N.E.2d 180.

{¶ 48} The trial court abused its discretion by initially dismissing the capital specifications because of the *"potential* impact of financial considerations" on appellant's due process rights. (Emphasis added.) See *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144 ("abuse of discretion" defined to mean a decision that is unreasonable, arbitrary, or unconscionable). The trial court's concerns about inadequate funding of appellant's capital trial were speculative and without a factual basis. The defense did not claim in the motion to dismiss that financial considerations threatened appellant's right to a fair trial. Moreover, the prosecutor assured the court that funding was available for defense witnesses and counsel fees and that appellant's due process rights were in no danger of being violated.

{¶ 49} We conclude that the trial court properly exercised its discretion in reinstating the capital specifications upon learning that the underlying premise for its earlier ruling was flawed. Indeed, "[a] court has the 'inherent power to regulate the practice before it and protect the integrity of its proceedings.'"

*State v. Busch* (1996), 76 Ohio St.3d 613, 615, 669 N.E.2d 1125, citing *Royal Indemn. Co. v. J.C. Penney Co.* (1986), 27 Ohio St.3d 31, 33–34, 27 OBR 447, 501 N.E.2d 617. Reinstatement of the capital specifications did not violate appellant's right to a fair trial, and appellant does not argue that the defense was unprepared for trial after the capital specifications were reinstated.

{¶ 50} Second, appellant claims that constraints on the trial court's discretion to dismiss the capital specifications were unfair and arbitrary in view of Crim.R. 11(C)(3), which states, "If the indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interests of justice."

{¶ 51} Appellant argues that Crim.R. 11(C)(3) is unconstitutional because it affords a defendant who pleads guilty the benefit of judicial discretion "in the interests of justice" while denying the same to him because he pleaded not guilty and exercised his right to a jury trial. We have rejected similar attacks on Crim.R. 11(C)(3). See *State v. Dickerson* (1989), 45 Ohio St.3d 206, 214, 543 N.E.2d 1250; *State v. Buell* (1986), 22 Ohio St.3d 124, 138, 22 OBR 203, 489 N.E.2d 795.

{¶ 52} Third, appellant asserts that the prosecutor misled the trial court by claiming that the court's dismissal "comes at an unacceptable cost to fair justice required by Ohio's citizens and the families of Emily Murray and Gregory Julius [sic]." Appellant makes this claim because he asserts that the Murray family did not want appellant to receive the death penalty.

{¶ 53} The prosecutor's motion for reconsideration did not assert that the Murray family wanted the death penalty. Although Murray family members requested during the penalty phase that appellant receive life in prison rather than the death penalty, the record does not show that the prosecutor was aware of these wishes at the time of this motion. The motion related to dismissing the capital specifications because of financial considerations and had nothing to do with the Murray family's desires concerning the death penalty. Moreover, the trial court could not have been unduly influenced by the prosecutor's reference to the Murray family. A trial judge is presumed to consider " 'only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65.

{¶ 54} Finally, appellant argues that his due process rights were violated because he waived his right to a speedy trial in exchange for an evidentiary hearing on a motion for reconsideration that was never conducted. The facts do not support this claim.

{¶ 55} On April 30, 2001, appellant filed an indefinite waiver of his right to a speedy trial. On August 21, 2002, appellant withdrew this waiver, filed a speedy-trial demand for the murder of Julious, and requested that the trial proceed as scheduled on September 23, 2002. Appellant, however, offered to waive his demand for a speedy trial on all counts if the trial court granted a full evidentiary hearing on the motion for reconsideration of the capital specifications.

{¶ 56} On August 23, 2002, the trial court vacated its earlier ruling, reinstated the capital specifications, and held that the trial would proceed on September 23, 2002. The trial court's ruling avoided the need for an evidentiary hearing. Moreover, appellant suffered no prejudice, because the trial proceeded on the date that the defense had requested in its speedy-trial demand.

{¶ 57} Based on the foregoing, we overrule proposition VII.

{¶ 58} *Pretrial publicity.* In proposition of law VIII, appellant argues that the trial court erred by refusing defense requests for a change of venue and for funding to conduct a scientific jury survey.

{¶ 59} 1. **Change of venue.** Extensive pretrial publicity surrounded appellant's case on television and in the newspapers. National media focused on the case after the judge dismissed the capital specifications because of financial considerations and later reinstated them.

{¶ 60} A motion for change of venue is governed by Crim.R. 18(B), which provides that "the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Crim.R. 18(B) does not require a change of venue merely because of extensive pretrial publicity. The decision whether to change venue rests in the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710.

{¶ 61} We have stated that " 'a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " Id. at 117, 559 N.E.2d 710, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749. "Only in rare cases may prejudice be presumed." Id.; see, also, *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554–555, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 62} Our review of the voir dire examination does not support appellant's claim of prejudicial pretrial publicity. During voir dire, each seated juror was individually questioned about pretrial publicity. Although all of the jurors had

some knowledge about the case, seven of the jurors had formed no opinion about it. Four other jurors were not asked whether they had formed an opinion about the case, but they agreed to disregard anything that they had heard outside court. The remaining juror stated that he had "[n]ot really formed an opinion, but it leans toward that." Further questioning showed that this juror knew few details about the case. Finally, all 12 of the jurors agreed to set aside anything that they had heard and decide the case solely upon the evidence presented in court.

{¶ 63} Moreover, the defense did not challenge any of the seated jurors for cause due to pretrial publicity. The absence of defense challenges indicated that the defense, after voir dire was completed, was not particularly troubled by the jury's exposure to pretrial publicity. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 52; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 37.

{¶ 64} Appellant has not shown that any juror was biased. Under these circumstances, we find that the trial court did not abuse its discretion by refusing to change venue.

{¶ 65} **2. Scientific jury survey.** The state must provide an indigent criminal defendant with funds to obtain expert assistance "only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus.

{¶ 66} In his motion for an expert to conduct a scientific jury survey, appellant asserted that a "scientific survey [was] necessary to prove the obvious that because of the publicity a fair trial cannot be had within Vinton County." Such a generalized assertion does not qualify as the "particularized showing" required by *Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus. Furthermore, comprehensive voir dire examination of the seated jurors about pretrial publicity negated any need for a scientific jury survey of public opinion within Vinton County. Thus, we find that appellant has failed to demonstrate that denial of the requested expert denied him a fair trial. See *Mason*, 82 Ohio St.3d at 152, 694 N.E.2d 932 (services of a mass-media expert unnecessary); *Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710 (psychologist for jury selection unnecessary); *State v. Jenkins* (1984), 15 Ohio St.3d 164, 193, 15 OBR 311, 473 N.E.2d 264 (sociologist to assist voir dire unnecessary).

{¶ 67} Based on the foregoing, we find that proposition VIII has no merit.

### Trial Issues

{¶ 68} *Sufficiency and manifest weight of the evidence*. In proposition of law I, appellant challenges the sufficiency and manifest weight of the evidence for

his convictions of aggravated felony murder in Count 1, the R.C. 2929.04(A)(7) kidnapping specification, and the separately charged kidnapping offense.

{¶ 69} Although both are raised by appellant in one proposition of law, a challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence. See *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 30.

{¶ 70} In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; see, also, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

{¶ 71} A claim that a jury verdict is against the manifest weight of the evidence involves a different test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 72} Appellant argues that the state did not prove that he kidnapped Murray. Appellant argues that no witnesses testified that they saw him remove or restrain Murray, and no evidence was presented about where she was murdered. Appellant uses the same rationale in arguing that his convictions for these offenses are against the manifest weight of the evidence.

{¶ 73} We find that appellant's sufficiency claims lack merit. The state proved that appellant kidnapped Murray by showing that Murray and appellant left work at approximately the same time on the night Murray disappeared, that Murray's car was found parked behind appellant's trailer, and that Murray's murdered body was found rolled in a carpet inside appellant's trailer. Further, the evidence proved that Murray did not have her wallet, driver's licenses, and credit cards when she disappeared and that Murray did not tell anyone she was leaving the area, despite her habit of informing friends of her whereabouts. Additionally, appellant lied when Murray's friend asked about her, and appellant also told a co-worker that she was "probably dead." Appellant also falsely told Kimberly Zimmerman that the Subaru behind his trailer belonged to his boss or a friend, "and they were down there probably hunting."

{¶ 74} The evidence also established that the location of Murray's murder was appellant's trailer. A copper bullet jacket found in the living room of the trailer had Murray's DNA on it, and a bullet hole was discovered in the bloodstained living-room carpet.

{¶ 75} We also reject appellant's claim that the evidence was insufficient because there were no eyewitnesses. We have "long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish* (1990), 50 Ohio St.3d 231, 238, 553 N.E.2d 1026. Here, circumstantial evidence, forensic testimony, and appellant's own statements proved beyond a reasonable doubt that appellant kidnapped and murdered Murray. Forensic evidence showed that the copper bullet jacket and bullets removed from a tree behind appellant's trailer were "fired from the same firearm." Moreover, the fact that appellant used a gun for target practice on his property linked him to the weapon that killed Murray.

{¶ 76} As to appellant's manifest-weight challenges, this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717. We find that the jury neither lost its way nor created a miscarriage of justice in convicting appellant of aggravated felony murder, the kidnapping-murder specification, or the separate offense of kidnapping. Proposition I is overruled.

{¶ 77} *Evidentiary issues.* In proposition of law III, appellant argues that the trial court erred by admitting evidence of his marital infidelity, his reaction to the presence of the police, and the introduction of victim-impact evidence.

{¶ 78} 1. **"Other acts" evidence.** Amber Hammers and appellant worked together at Flappers Bar, a Mount Vernon bar and grill then owned by an owner of the Pirate's Cove. Hammers testified that appellant called and asked her to go dancing with him. Hammers told appellant that she had not talked to her boyfriend about going dancing with another man, and no plans were made.

{¶ 79} Gloria Ressler and appellant worked together at the Pirate's Cove. Ressler testified that following Murray's disappearance, appellant called her on three occasions during November 2000 and asked "if he could come over and hang out, have a party, come out and just have [her] and him * * * out there." Appellant also approached her at work and said, "[W]e could have a quickie and [your fiancé] wouldn't have to know."

{¶ 80} Lisa Perkins testified that at one point, appellant gave her a ride in his car and along the way, appellant "stopped up on the top of the hill, and * * * he just started talking and touching [her] and [they] had sex up on the hill in the car." Dana Bostic testified that appellant had spent the night with Perkins at

Bostic's home. Following Julious's disappearance, appellant told Bostic that "his plans were * * * to leave his wife [and] * * * come and stay with [Bostic] and Lisa at [Bostic's] house."

{¶ 81} Paul Amstutz, a former Pirate's Cove delivery driver, testified about a conversation with Kathy McKnight about appellant's whereabouts. During a food delivery to the McKnight home, Kathy indicated to Amstutz that she thought that appellant was working that evening at the Pirate's Cove. Amstutz knew, however, that appellant was not working that evening and was instead drinking at the Pirate's Cove bar.

{¶ 82} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible * * * [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." However, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 83} The trial court did not abuse its discretion in admitting Hammers's and Ressler's testimony. That evidence related to appellant's modus operandi, or plan. Evidence showing a modus operandi is admissible because " 'it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator.' " *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 104, quoting *State v. Lowe* (1994), 69 Ohio St.3d 527, 531, 634 N.E.2d 616.

{¶ 84} Hammers and Ressler helped to establish appellant's opportunity, preparation, and plan to acquaint himself and be alone with Murray. Appellant's phone calls to Hammers and Ressler showed that appellant developed an interest in his co-workers and asked them out. This pattern of behavior showed the likelihood that appellant also developed an interest in Murray. Thus, the jury could reasonably infer from the testimony of Hammers and Ressler that appellant had asked Murray for a ride after work.

{¶ 85} We also reject appellant's argument that his phone calls to Ressler were not admissible because they were made after Murray's disappearance. "[P]ursuant to Evid.R. 404(B), * * * evidence of subsequent crimes or acts of misconduct is admissible if it is relevant to an issue at trial and its probative value is not outweighed by its prejudicial effect." *Cleveland v. Dillingham* (May 11, 1995), Cuyahoga App. No. 67693, 1995 WL 277105, *4. Appellant's phone calls, though made two or three weeks after Murray's disappearance, were relevant in establishing appellant's modus operandi.

{¶ 86} Moreover, the trial court provided the jury with cautionary instructions on "other acts" evidence. The jury was advised: "Evidence was introduced that

the defendant may have committed other acts other than the offenses with which he was charged in this case. If you find that the evidence of other acts is true * * *, you may consider that evidence only for the purpose of deciding whether it proves Gregory McKnight's motive, opportunity, intent or purpose or plan to commit kidnapping of Emily Murray. The evidence may not be considered for any other purpose. It was not received, and you may not consider it to prove the character of Gregory McKnight in order to show that he acted in conformity with that character." In view of these instructions and the probative value of the testimony of the two women, the trial court did not abuse its discretion in admitting this "other acts" evidence. See *State v. Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 48.

{¶ 87} We also find that the testimony about appellant's visits to Perkins in Bostic's home was relevant to show how appellant and Julious knew each other. Thus, the trial court did not abuse its discretion in admitting such evidence.

{¶ 88} Testimony that appellant and Perkins had sex in appellant's car and spent the night together at Bostic's home was not relevant and not admissible under Evid.R. 404(B). Nevertheless, we find that the impact of such testimony was minimal and not prejudicial given other compelling evidence of appellant's guilt. See *Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 49.

{¶ 89} **2. Reaction to the police.** Two to three weeks before Julious was murdered, appellant, Kathy, Bostic, and Julious drove from Chillicothe to Columbus to go to a reggae club. Over defense objection, Bostic testified that when they "pulled into a parking lot [of the reggae club] * * * there was police sitting in the parking lot." Bostic testified that appellant said, " 'There's the police.' And then we turned * * * out of the parking lot and we drove all the way back home."

{¶ 90} We find that the trial court abused its discretion in admitting this testimony. Appellant's reaction to the police occurred *before* he murdered either Julious or Murray. This evidence did not prove consciousness of guilt, because there was no connection between appellant's reaction to the police and the charged offenses. Appellant's reaction to the police, however, was not tied to any other misconduct, and he was not prejudiced by such testimony. Thus, the introduction of this evidence constituted harmless error.

{¶ 91} **3. Victim-impact comment and testimony.** During his opening statement, the prosecutor stated, "Two years ago, Emily S. Murray was attending Kenyon College in Gambier, Ohio. She was in her junior year, and she was 20 years young." Further, the prosecutor stated, "At work, Emily was well-liked. She was outgoing, she was helpful, she was a good waitress."

{¶ 92} Thomas Murray, the victim's father, testified that he had a "very close" relationship with his daughter. He added, "Emily was in touch with her mother

or me or both of us almost every day." According to Thomas, Emily "was very responsible; she was just a very honest kid." Moreover, Murray returned from a religious retreat about ten days before her disappearance and was "really excited about becoming a priest." Thomas also testified that when he learned of his daughter's disappearance, "it was like somebody hit [him] in the stomach with a sledgehammer."

{¶ 93} Cynthia Murray, the victim's mother, described a "very close relationship" with Murray, said Murray was "easy to love," and testified that Murray "wanted to become an Episcopal priest."

{¶ 94} Megan DiCarlo, a college friend, described Murray as "very outgoing, very social, independent, very open with people, trusting of people. Like she always looked for the best in people." Kate Murray, another college friend, described Murray as "[v]ery outgoing, had a lot of friends, very friendly." Kate also testified that Murray was very religious, and the tattoo of a dove on Murray's back symbolized this interest.

{¶ 95} Michael Corrigan, the general manager of the Pirate's Cove, stated that Murray was "courteous and cared for people, and she was a very upbeat person, fun to work with." On the night she disappeared, Murray was "very upbeat and happy." Nathan Justice also testified that Murray was a "very nice, happy person."

{¶ 96} During the guilt-phase closing argument, the prosecutor described Murray's disappearance as "every parents' worst nightmare," repeated Thomas Murray's statement that "they felt as if they had been hit in the stomach with a sledgehammer," and mentioned that "that pain in their stomach stays with them today." The prosecutor also argued that Murray was "nice" and "kind-hearted" and might have given appellant a ride on the night she disappeared.

{¶ 97} The defense filed a motion in limine to exclude victim-impact evidence. Nevertheless, except where noted, the defense did not renew its objection to the foregoing testimony at trial and thus waived all but plain error. See *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34 ("a ruling on a motion in limine may not be appealed and * * * objections * * * must be made during the trial to preserve evidentiary rulings for appellate review").

{¶ 98} Evidence relating to the facts attendant to the offense is "clearly admissible" during the guilt phase, even though it might be characterized as victim-impact evidence. *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878. Thus, testimony that Murray was friendly, outgoing, and trusting was admissible in showing the likelihood that Murray provided appellant a ride in her car on the night she disappeared. Moreover, testimony that Murray was a responsible person was admissible in showing that she would not have left campus in her car without taking her wallet and driver's license.

{¶ 99} The defense objected to Thomas's and Cynthia's testimony because of the lack of foundation to prove habit but did not object to the testimony as inappropriate victim-impact evidence. Thomas's and Cynthia's close personal relationship and frequent contact with their daughter laid the foundation about Murray's habit of notifying family members as to her whereabouts before making a trip, and this testimony was also admissible. Thomas's testimony that his daughter's disappearance was "like somebody hit [him] in the stomach with a sledgehammer" was of questionable relevance; however, such testimony did not constitute outcome-determinative plain error. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 679, 687 N.E.2d 1358; cf. *State v. Hartman* (2001), 93 Ohio St.3d 274, 293, 754 N.E.2d 1150.

{¶ 100} Testimony about Murray's upbeat mood before her disappearance, her strong religious beliefs, and her aspirations to become an Episcopal priest was admissible in rebutting arguments that Murray might have committed suicide.

{¶ 101} Kate Murray's testimony about the tattoo of a dove on Murray's back was relevant in identifying Murray's body. See *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 108 (photos of victim's tattoo admissible to help identify the victim).

{¶ 102} As to the prosecutor's opening statement and closing argument, the trial counsel failed to object and thus waived all but plain error. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. There was no plain error. The prosecutor's brief description of Murray in his opening statement simply pointed out her age and that she had attended Kenyon College, which explained why she lived in Gambier. Cf. *Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 56 (description of victims' lives established that the victims had been living persons, an element of the charge of aggravated murder).

{¶ 103} The prosecutor's remarks during closing argument also did not result in plain error. The prosecutor described Murray as a nice, kind-hearted, and helpful person to point out the likelihood that Murray provided a ride to appellant on the night she disappeared. The prosecutor's comments about Thomas's and Cynthia's pain and anguish simply pointed out the obvious feelings that Murray's parents experienced following their daughter's death. Moreover, the prosecutor's remarks in question were very brief and not overly emotional.

{¶ 104} Based on the foregoing, we reject proposition III.

{¶ 105} *Habit evidence.* In proposition of law X, appellant argues that the trial court erred by admitting habit testimony.

{¶ 106} Over defense objection, the state presented evidence of Murray's habit of informing family and friends about her whereabouts before departing on a trip.

Thomas Murray testified that her family and friends maintained close contact with Murray as to her whereabouts following Murray's suicide attempt in May 2000. Murray exchanged phone calls and e-mails with her parents on an almost daily basis. During the fall of 2000, Murray remained in contact with her parents when she traveled to Japan and made a trip to St. Louis. Following this testimony, the prosecutor asked Thomas:

{¶ 107} "Q: Was it common for Emily to tell you where she might be going before she left?

{¶ 108} "A: Anything of significance, yes, sir.

{¶ 109} " * * *

{¶ 110} "Q: Could you restate your answer?

{¶ 111} "A: Emily was in very close touch with us, and also with her friends, so if it was anything significant, we would have known about it, she would have told us, and she certainly would have told her friends."

{¶ 112} Megan DiCarlo, Murray's roommate, testified that she and Emily used a dry-erase board to leave a message "if one of [them] went somewhere." The prosecutor also asked DiCarlo:

{¶ 113} "Q: Did Emily use the board when she took a trip, maybe a weekend or two before?

{¶ 114} "A: Uh-huh. She had gone to see a friend in Cleveland a couple weeks beforehand * * * and had left a message like filling almost the entire board about where she was going, when she planning on leaving, when she was planning on being back, who she was going to see, and a phone number for that person.

{¶ 115} "Q: The night that Emily didn't come back, was there any notes on that board?

{¶ 116} "A: No, there weren't.

{¶ 117} "Q: Were there any notes anywhere else in the dorm room?

{¶ 118} "A: No.

{¶ 119} "Q: Did you get any phone messages?

{¶ 120} "A: No."

{¶ 121} Kate Murray, a former roommate, also testified about Murray's habit of informing her friends about her whereabouts:

{¶ 122} "Q: I'm not talking about guessing what she might do in the future. While you were her roommate, while you knew her, did she ever disappear unaccounted for and then reappear and say, 'Well, I'm sorry, sorry?'

{¶ 123} "A: No.

{¶ 124} "Q: How do you know that?

{¶ 125} "A: I would—from personal experience of living with her, it's a very small campus, you see people a lot, and if she had disappeared for any amount of time, we would have noticed.

{¶ 126} "Q: Did she ever leave * * * unexpectedly?

{¶ 127} "A: Yes, one night she drove up to Cleveland to see a friend, but then when she did go that time—and no one knew she was going—she left us a note saying where she was going.

{¶ 128} "Q: Where did she leave the note?

{¶ 129} "A: I assume in her room. I don't know."

{¶ 130} Evid. R. 406 provides: "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Evid.R. 406 is identical to Rule 406 of the Federal Rules of Evidence.

{¶ 131} Evid.R. 406 does not define habit. "Habit," however, has been defined as a "person's regular practice of meeting a particular kind of situation with a specific type of conduct." See Advisory Committee's Notes, Rules of Evidence for United States Courts and Magistrates (1973), 56 F.R.D. 183, 223. Although a precise formula does not exist for determining when the behavior may become so consistent as to rise to the level of habit, "adequacy of sampling and uniformity of response are key factors." Id. at 224; see, also, *United States v. Newman* (C.A.1, 1992), 982 F.2d 665, 668; *Reyes v. Missouri Pacific RR. Co.* (C.A.5, 1979), 589 F.2d 791, 795. These factors focus on whether the behavior at issue " 'occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances.' " *Newman*, 982 F.2d at 668, quoting *Weil v. Seltzer* (C.A.D.C.1989), 873 F.2d 1453, 1460.

{¶ 132} Murray's father and two of her close friends established Murray's habit of notifying friends and family members of her whereabouts before departing on a trip. Murray's daily phone calls and e-mails with her father as to her whereabouts, and her practice of leaving notes as to her whereabouts with her friends were " 'numerous enough to base an inference of systematic conduct,' " permitting the admissibility of the testimony. *Wilson v. Volkswagen of Am., Inc.* (C.A.4, 1977), 561 F.2d 494, 511, quoting *Strauss v. Douglas Aircraft Co.* (C.A.2, 1968), 404 F.2d 1152, 1158.

{¶ 133} We reject appellant's argument that Murray's behavior was a volitional act and therefore not admissible as habit evidence. Activities that are "semiautomatic or nearly nonvolitional, can be easily classified as habit." 1 Giannelli & Snyder, Evidence (2d Ed.2001) 265, Section 406.4. For example, locking the door

of a house or traveling home from work by the same route are examples of habitual acts that may become semiautomatic and thus tend to prove that one acted in a particular situation in the same manner. Id.; see, also, *Cardinal v. Family Foot Care Ctr., Inc.* (1987), 40 Ohio App.3d 181, 182, 532 N.E.2d 162 ("habitual acts may become semi-automatic and may tend to prove one acted in the particular case in the same manner").

{¶ 134} Similarly, Murray's repeated practice of notifying friends and family of her whereabouts before departing on a trip became a semiautomatic form of behavior that was admissible to prove habit. See *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675 (testimony that victim was an immaculate housekeeper was admissible under Evid.R. 406 to show she would likely have wiped the defendant's fingerprints off her glasses); see, also, *Perrin v. Anderson* (C.A.10, 1986), 784 F.2d 1040, 1045–1046 (five instances of violent encounters with the police sufficient to establish "habit" of reacting violently to uniformed police officers); *Meyer v. United States* (C.A.10, 1980), 638 F.2d 155, 156–158 (dentist's routine to advise patients of potential risks of extractions admissible to show that he acted in conformity with that habit when dealing with the plaintiff).

{¶ 135} We also reject appellant's argument that habit evidence should not have been admitted because the testimony did not identify a specific manner that Murray used to notify her friends and family of her whereabouts. Testimony established that e-mails, phone calls, and notes were Murray's specific methods for notifying family and friends as to her whereabouts.

{¶ 136} Finally, sufficient examples of Murray's conduct demonstrated Murray's habit. Murray exchanged e-mails and phone calls with her parents on almost a daily basis, remained in daily contact with her father as to her whereabouts in Japan, and notified her parents about her trip to St. Louis. Moreover, college friends testified that Murray left notes and information as to her whereabouts on an erase board before departing on trips. Cf. *Bollinger, Inc. v. Mayerson* (1996), 116 Ohio App.3d 702, 715, 689 N.E.2d 62 (testimony about two isolated instances of alleged cheating was not sufficient evidence of habit under Evid.R. 406).

{¶ 137} The trial court did not abuse its discretion in admitting testimony about Murray's habit under Evid.R. 406. Thus, proposition X is overruled.

{¶ 138} ***Gruesome photographs.*** In proposition of law XII, appellant argues that the trial court erred in admitting gruesome autopsy and crime-scene photographs.

{¶ 139} The defense failed to object to gruesome photographs at trial and has waived all but plain error. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 49. The defense motion in limine to exclude crime-scene and

gruesome photographs did not preserve this issue. *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34.

{¶ 140} Nonrepetitive photographs, even if gruesome, are admissible in capital cases as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 141} **1. Crime-scene photographs.** Appellant complains about four crime-scene photographs. State's exhibits Nos. 47 through 49 depict Murray's body as it was found in the carpet. State's exhibit No. 116 depicts Murray's fully clothed body after the carpet was unrolled. There was no plain error in admitting this evidence. These photos portrayed Murray in relation to the crime scene and illustrated the testimony of Special Agent Wilgus and others who saw the crime scene. See *State v. Twyford* (2002), 94 Ohio St.3d 340, 358, 763 N.E.2d 122; *State v. Hartman*, 93 Ohio St.3d at 288, 754 N.E.2d 1150.

{¶ 142} **2. Autopsy photographs.** Appellant also objects to nine autopsy photographs. State's exhibit No. 144 is a photograph of the carpet before it was unrolled and contains no image of Murray's body. State's exhibit No. 117 is a photograph of Murray's body from her thighs to beneath her breast line and shows that she is wearing a pair of panties with the word "Thursday" on them. That evidence was relevant because Thursday was Murray's last day of work at the Pirate's Cove. State's exhibit No. 112 showed the tattoo of a dove on her back and was a prominent identifying mark on her body.

{¶ 143} State's exhibits Nos. 119, 148, and 149 depict Murray's right and left hands. These photographs supported the coroner's testimony that no blood spatter was found on Murray's hands or arms, an absence that helped show that Murray was not a suicide victim.

{¶ 144} State's exhibit No. 147 is a decidedly gruesome photograph showing the entry gunshot wound in Murray's head. State's exhibit No. 146 is another gruesome photograph depicting the exit wound underneath Murray's ear. State's exhibit No. 145 is an X-ray of Murray's skull showing bullet fragments lodged in her head. These photographs supported the coroner's testimony that Murray suffered "one gunshot wound * * * coming through the brain and the neck and coming out on the left side of the neck."

{¶ 145} No plain error occurred in admitting the autopsy photographs. The autopsy photographs depicted the victim's wounds, illustrated the coroner's testimony, and helped prove appellant's intent. See *State v. Hughbanks*, 99 Ohio

St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 73;  *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 36.

{¶ 146} We also reject appellant's complaint about the reintroduction of the photographs during the penalty phase.   The defense did not object to their reintroduction at trial, and no plain error occurred by allowing these photographs into evidence.  *Twyford*, 94 Ohio St.3d at 358, 763 N.E.2d 122;  *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542.

{¶ 147} Based on the forgoing, we overrule proposition XII.

{¶ 148} *Admissibility of Murray's notebook and notepad.*   In proposition of law XV, appellant argues that the trial court abused its discretion by refusing to admit all of Murray's notebooks and notepads into evidence because they rebutted the state's evidence that she was a happy and upbeat person.

{¶ 149} The police recovered Murray's notebooks and notepads from her dorm room.   During the defense case, trial counsel sought to introduce all of Murray's writings into evidence.   The trial court admitted most of Murray's composition notebook into evidence.

{¶ 150} In reviewing the record, it appears that the documents admitted as defense exhibit H include Murray's reflections about her suicide attempt on May 5, 2000, her feelings about hospitalization and therapy, her self-analysis, and a drawing of a partial stick figure being hanged.   Murray's letter to a friend dated June 14, 2000, is the latest date on any of the writings.

{¶ 151} The trial court did not admit other parts of defense exhibit H that included undated loose papers, page 12 from the notebook, a legal pad that contained a letter dated January 2, 1999, and other undated writings.   These miscellaneous papers contain fictional stories, several drawings, and Murray's reflections about life that did not mention suicide.   The trial court also did not admit Murray's notebook pad and miscellaneous papers.   Defense exhibit G includes fictional stories, letters to friends, and two undated notes that mention a friend's suicide attempt and discuss Murray's feelings about dying and suicide. The latest date on writings in defense exhibit G was July 20, 1999.

{¶ 152} The notebooks and notepads that the trial court excluded from evidence were neither relevant nor admissible under Evid.R. 401.   The evidence at the crime scene—Murray's body found rolled in a carpet—and the coroner's testimony ruled out suicide as a possible cause of death.   Thus, testimony about Murray's depression and her fixation on death was simply not relevant.

{¶ 153} Furthermore, any assertions contained in the excluded evidence were inadmissible hearsay.   Evid.R. 803(3), the "state of mind" exception to the hearsay rule, governs the admissibility of Murray's hearsay statements.   Evid.R. 803(3) provides for the admissibility of "[a] statement of the declarant's *then*

*existing* state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." (Emphasis added.)

{¶ 154} The excluded evidence was not admissible under Evid.R. 803(3), because the latest date on any of the documents was July 20, 1999, which was more than a year before Murray's death. The state's evidence about Murray's state of mind related to the summer and fall of 2000, just prior to her disappearance.

{¶ 155} Moreover, none of Murray's excluded writings were admissible as statements of present intent to take future action. See *Sage,* 31 Ohio St.3d at 183, 31 OBR 375, 510 N.E.2d 343 (declarant's statement that she intended to "break up" with defendant admitted to negate defendant's contention that declarant was suicidal); *Mut. Life Ins. Co. v. Hillmon* (1892), 145 U.S. 285, 295–296, 12 S.Ct. 909, 36 L.Ed. 706. None of Murray's excluded statements or her other writings that were admitted into evidence indicate that she intended to commit suicide.

{¶ 156} The trial court did not abuse its discretion in refusing to admit all the notebooks and notepads found in Murray's room. Moreover, appellant suffered no prejudice, because most of the documents from Murray's notebook and notepad that mentioned suicide were admitted.

{¶ 157} Based on the foregoing, proposition XV is overruled.

{¶ 158} *Course of conduct.* In proposition of law II, appellant argues that his conviction for a "course of conduct" specification is based on insufficient evidence and is against the manifest weight of the evidence. Appellant also asserts that R.C. 2929.04(A)(5) is unconstitutionally vague.

{¶ 159} 1. **Constitutional challenge.** "The course-of-conduct specification set forth in R.C. 2929.04(A)(5) is not void for vagueness under either the Eighth Amendment to the United States Constitution or Section 9, Article I of the Ohio Constitution." *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701, syllabus. Accord *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 715 N.E.2d 1144; *State v. Brooks* (1996), 75 Ohio St.3d 148, 155, 661 N.E.2d 1030. We find that no basis exists to overturn that ruling.

{¶ 160} 2. **Sufficiency and manifest weight of the evidence.** Appellant contends that the murders of Murray and Julious were not part of a "course of conduct" within the meaning of R.C. 2929.04(A)(5). Appellant argues that the murders occurred five and one-half months apart and Murray and Julious had no connection with one another.

{¶ 161} Our recent opinion in *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus, sets forth a test for "course of conduct." *Sapp* states, "The statutory phrase 'course of conduct' found in R.C. 2929.04(A)(5) requires that the *state establish some factual link* between the aggravated murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact 'must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together.' " (Emphasis added.) Id., syllabus, quoting *State v. Cummings* (1992), 332 N.C. 487, 510, 422 S.E.2d 692. Moreover, "the factual link might be one of time, location, murder weapon, or cause of death." Id. at ¶ 52. Ultimately, "when two or more offenses are alleged to constitute a course of conduct under R.C. 2929.04(A)(5), all the circumstances of the offense, must be taken into account." Id. at ¶ 56.

{¶ 162} Significant similarities exist between the two murders. Murray and Julious were both acquaintances of appellant. Appellant was driving alone with both victims before their disappearances. Appellant also shot both victims in the head and disposed of their bodies on his property.

{¶ 163} Moreover, the passage of five and one-half months between the two murders does not invalidate appellant's course-of-conduct specification conviction. Indeed, "murders taking place at different times 'may satisfy the R.C. 2929.04(A)(5) specification so long as the offender's actions were part of a continuing course of criminal conduct.' " *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 55, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 71.

{¶ 164} In *Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 57, ¶ 61, this court found that murders committed more than a year apart were part of the same course of conduct because of common motive and similarity in the offenses. See, also, *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 444, 650 N.E.2d 878 (five murders over a five-month period represented a course of conduct); *Benner*, 40 Ohio St.3d at 320, 533 N.E.2d 701 (two murders and an attempted murder over a five-month period evidenced a course of conduct). In this case, the similarities in the Murray and Julious murders establish a course of conduct despite the lapse of five and one-half months.

{¶ 165} In conclusion, we reject appellant's claim that the evidence was insufficient to support his conviction for a course-of-conduct specification in the murders of Julious and Murray. The two murders involved similarities in the commission of the offenses, the causes of death, and the disposal of the bodies. Based on the totality of the circumstances, we find that evidence was sufficient to support appellant's conviction of a course-of-conduct specification in the murders of Julious and Murray.

{¶ 166} As to appellant's manifest-weight challenge, we find that this is not " 'the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. The jury neither lost its way nor created a miscarriage of justice in convicting appellant on the course-of-conduct specification.

{¶ 167} Based on the foregoing, we reject proposition II.

{¶ 168} *Joinder.* In proposition of law VI, appellant contends that the trial court erred in denying his motion to sever Count 6, the charge for Julious's murder, from the rest of the charges. Appellant argues that joinder of the charges was improper because the Julious and Murray murders were unrelated.

{¶ 169} "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, quoting Crim.R. 8(A). A defendant requesting severance "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288. A defendant claiming error in the denial of severance must affirmatively show that his rights were prejudiced and that the trial court abused its discretion in refusing separate trials. Id.

{¶ 170} The trial court did not abuse its discretion in denying the motion to sever, and appellant was not prejudiced by joinder. First, evidence of Julious's murder was necessary to prove the R.C. 2929.04(A)(5), course-of-conduct specification. See *State v. Hamblin* (1988), 37 Ohio St.3d 153, 159, 524 N.E.2d 476; see, also, *Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 71; *Benner*, 40 Ohio St.3d at 306, 533 N.E.2d 701.

{¶ 171} Moreover, the evidence proving the two murders was interlocking. Indeed, evidence relating to both murders would have been admissible at separate trials to prove appellant's identity by modus operandi under Evid.R. 404(B). See, generally, *State v. Jamison* (1990), 49 Ohio St.3d 182, 185, 552 N.E.2d 180. During each murder, appellant was alone with the victim, drove with the victim somewhere, shot the victim in the head, and disposed of the body at his trailer. See *Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 72.

{¶ 172} Finally, the evidence of appellant's guilt is "amply sufficient to sustain each verdict, whether or not the indictments were tried together." *Torres*, 66 Ohio St.2d at 344, 20 O.O.3d 313, 421 N.E.2d 1288. Circumstantial evidence, forensic testimony, and appellant's own statements provided strong evidence of his guilt for each murder. The strength of the state's proof "establishes that the prosecution did not attempt to prove one case simply by questionable evidence of

other offenses." *Jamison*, 49 Ohio St.3d at 187, 552 N.E.2d 180.   Based on the foregoing, proposition VI is overruled.

### *Juror misconduct*

{¶ 173} **1.   Sleeping jurors.**   In proposition of law XI, appellant asserts that sleeping jurors violated his right to a fair trial.   The first alleged instance of a juror's sleeping was raised following Detective Brenneman's direct examination, when the prosecutor informed the trial court:

{¶ 174} "Mr. Gleeson:  Your Honor, Mr. Miller requests, he's noticing some of the jurors are kind of sweltering.   Perhaps we should give them ten minutes to walk around, put on the air conditioner.   Of course, I think they're sleeping, and it's not to cross yet.

{¶ 175} "The Court:  I agree.   I think that's appropriate.

{¶ 176} "Mr. Miller:  That's fine."

{¶ 177} The second alleged instance of a juror's sleeping was raised by the prosecutor following Heather Zollman's testimony:

{¶ 178} "Mr. Gleeson:  Your Honor, I take full responsibility for this because my presentation was probably not very exciting, but Melissa Trivette, one of our jurors, is like asleep.   She's not now, she's wide awake.   The cross must have been exciting, woke her up.   But I would just ask the Court to pay attention to her to see if she is dozing off, and if we need to take any corrective measures because of that.

{¶ 179} "The Court:  Okay. Well, the Court would note that she doesn't really look around that much anyway.   It's her position pretty much to just sit there and look straight ahead.

{¶ 180} "Mr. Gleeson:  Well, she was sleeping.

{¶ 181} "The Court:  I'm not doubting that.   I'm not doubting that.   I'm just saying that she does not look around—move around like other jurors typically do, or even * * * the other jurors here do.   She just pretty much * * * maintains a fixed position, as she has throughout.

{¶ 182} "Mr. Canepa:  Yeah, Judge.   Tim actually said the same thing to me, but I said, 'Well, that's usually true, except she had her eyes closed and her head down.'

{¶ 183} "The Court:  The Court will certainly take note of that, and be aware of that."

{¶ 184} It is well established that " '[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct' and 'the appropriate remedies for any demonstrated misconduct.' "   *United States v. Sherrill* (C.A.6, 2004), 388 F.3d 535, 537, quoting *United States v. Copeland* (C.A.6, 1995), 51 F.3d

611, 613. Moreover, a trial court has " 'considerable discretion in deciding how to handle a sleeping juror.' " *State v. Sanders* (2001), 92 Ohio St.3d 245, 253, 750 N.E.2d 90, quoting *United States v. Freitag* (C.A.7, 2000), 230 F.3d 1019, 1023.

{¶ 185} Appellant argues that the trial court should have questioned Juror Trivette to determine whether she was sleeping, or in the alternative, Juror Trivette should have been dismissed and replaced by an alternate juror. The defense did not request either remedy at trial and expressed no dissatisfaction with the trial court's handling of the matter. Thus, in the absence of plain error, this claim is waived. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 186} No plain error occurred. There was only a vague allegation that jurors were sleeping when the issue was first raised with the trial court. Juror Trivette was alleged to have been asleep during a later portion of the trial, but the defense has provided no evidence that this juror was in fact sleeping. Thus, whether Juror Trivette or any other juror was in fact sleeping is speculative. The trial court observed that Juror Trivette did not "move around like other jurors * * * [and] just [maintained] a fixed position, as she [had] throughout." The trial court noted counsel's concern about Juror Trivette's sleeping, but no further concern about sleeping jurors was raised during the trial.

{¶ 187} Moreover, appellant has provided no evidence of prejudice. Nothing in the record shows what part of the testimony, if any, jurors actually missed. See *Sanders*, 92 Ohio St.3d at 253, 750 N.E.2d 90 (affirming conviction where there was no evidence that the juror missed large or critical portions of the trial). Based on the foregoing, we reject proposition XI.

{¶ 188} **2. Outside conversations.** In proposition of law XIII, appellant argues that he was denied a fair trial because one juror discussed the case with a nonjuror during the trial.

{¶ 189} During the state's case, the prosecutor informed the trial court that Amy Warrix reported that her boyfriend, Terry Stewart, a juror, "has been talking to her about the case." The trial court then called Juror Stewart into chambers for questioning. Juror Stewart denied talking with Warrix about the trial. He stated that he had "never discussed the case with her at all, nothing about the facts or that deals with the case at all." Juror Stewart said that Warrix may have made these allegations against him because he had "left her last night, and she's a mean, hateful girl." Juror Stewart said that when Warrix tried to talk to him about the case, he told her, "I'm under oath not to talk about it and not to hear about it." He also told the court that he had followed those instructions. Juror Stewart also assured the court that he did not acquire any outside information about the case as a result of being around Warrix.

{¶ 190} Following the completion of Juror Stewart's questioning, defense counsel stated, "I'm satisfied with his explanation." Defense counsel indicated that no further inquiry was necessary and declined the opportunity to question Warrix. The trial court then stated, "The Court is satisfied as well at this point."

{¶ 191} In cases involving outside influences on jurors, trial courts are granted "broad discretion" in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. *State v. Phillips* (1995), 74 Ohio St.3d 72, 89, 656 N.E.2d 643. A trial court is permitted to rely on a juror's testimony in determining that juror's impartiality. *State v. Herring* (2002), 94 Ohio St.3d 246, 259, 762 N.E.2d 940. Moreover, issues concerning the weight given to the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Here, the trial court's ruling reflects that the court believed the juror's denial that he talked to Warrix about the case.

{¶ 192} Appellant argues that the trial court was obligated to conduct a *Remmer* hearing to question Warrix, and possibly other jurors, before making a determination that no improper contact had occurred. See *Remmer v. United States* (1954), 347 U.S. 227, 229–230, 74 S.Ct. 450, 98 L.Ed. 654. The defense, however, was "satisfied" with the juror's explanation and indicated that no further inquiry into the allegations was necessary. Thus, the trial court did not abuse its discretion. See *Sanders,* 92 Ohio St.3d at 252, 750 N.E.2d 90; *State v. Henness* (1997), 79 Ohio St.3d 53, 65, 679 N.E.2d 686 (upholding a trial court's refusal to question each juror individually).

{¶ 193} Appellant has failed to demonstrate that any juror misconduct occurred, and proposition XIII is overruled.

{¶ 194} *Courtroom outbursts.* In proposition of law XVI, appellant contends that courtroom outbursts deprived him of a fair trial.

{¶ 195} The first outburst occurred during the defense closing argument:

{¶ 196} "[Mr. Toy:] Why would [Gregory McKnight] want to kill Emily? * * * Emily liked Greg, according to Abigail Williams. Emily and Greg were considering a relationship, according to Nate Justice.

{¶ 197} "Audience member: No.

{¶ 198} "Mr. Toy: That's what he testified to."

{¶ 199} The trial counsel did not object to the outburst or request corrective action. Trial counsel then completed his closing argument without further disruption.

{¶ 200} The second outburst occurred following the trial court's announcement of the death sentence:

{¶ 201} "[The Court:] It is, therefore, the judgment of this Court that the aggravating circumstance in Count 1 of this case outweighs the mitigating factors by proof beyond a reasonable doubt. The defendant is hereby sentenced to death.

{¶ 202} "Audience member: Yes."

{¶ 203} "The impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record. 'Was the jury disturbed, alarmed, shocked or deeply moved? * * * These questions necessarily depend on facts which no record can reflect.'" *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068, quoting *State v. Bradley* (1965), 3 Ohio St.2d 38, 40, 32 O.O.2d 21, 209 N.E.2d 215. Thus, a trial court must determine, as a question of fact, whether an emotional outburst deprived the defendant of a fair trial. *State v. Scott,* 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. "In the absence of clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed." *Morales,* 32 Ohio St.3d at 255, 513 N.E.2d 267.

{¶ 204} The record does not show whether the jurors heard the first outburst, and if so, whether it had any effect on them. Further, neither counsel brought the outburst to the trial court's attention. Thus, it would be speculative to conclude that the one-word outburst was disruptive or prejudicial. Under these circumstances, we find that no "clear, affirmative evidence" exists that the outburst deprived appellant of a fair trial. Id.

{¶ 205} The jury had been discharged when the second outburst occurred during the announcement of the sentence. Clearly, no prejudice resulted. Accordingly, we find that proposition XVI has no merit.

{¶ 206} ***Defendant's absence.*** In proposition of law XIV, appellant argues that his absence during trial proceedings violated his constitutional rights.

{¶ 207} During pretrial proceedings on June 5, 2002, defense counsel informed the trial court that appellant did not object to being absent from conferences in chambers. The trial court then obtained appellant's consent to his absence during in-chambers proceedings:

{¶ 208} "Judge Simmons: * * * Just * * * [so] I'm fully satisfied you're in agreement, Mr. McKnight, but * * * you just heard what Mr. Carson said about * * * any discussions in chambers with counsel that that would be * * * [the] way those are typically conducted.

{¶ 209} "Mr. McKnight: Yes.

{¶ 210} "Judge Simmons: And he indicated that you and he were in agreement that that could be done in that way and * * * is that your agreement?

{¶ 211} "Mr. McKnight: Yes, I * * * agree with that."

{¶ 212} Appellant was absent from the in-chambers conference on allegations of juror misconduct. See Proposition XIII. Trial counsel waived appellant's presence and stated that appellant's absence was "by agreement or our position, he does not need to be present." Appellant was also absent from an in-chambers conference on proposed jury instructions. Trial counsel did not expressly waive appellant's presence at that conference.

{¶ 213} Appellant had a fundamental right to be present at all stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). A defendant's absence, however, does not necessarily result in prejudicial or constitutional error. See *State v. Green* (2000), 90 Ohio St.3d 352, 371, 738 N.E.2d 1208; *State v. Williams* (1983), 6 Ohio St.3d 281, 285–287, 6 OBR 345, 452 N.E.2d 1323.

{¶ 214} Appellant personally waived his right to be present at in-chambers conferences, and his waiver was valid for the two in-chambers proceedings that he now challenges. Thus, appellant's absence from the two in-chambers conferences was consistent with his wishes. See *Rice v. Wood* (C.A.9, 1995), 44 F.3d 1396, 1400 (defendant can waive his right to be present); see, also, *Polizzi v. United States* (C.A.2, 1991), 926 F.2d 1311, 1322–1323 (counsel can waive the defendant's right to be present).

{¶ 215} Appellant also fails to demonstrate how his absence prejudiced him. See *United States v. Brown* (C.A.6, 1978), 571 F.2d 980, 987 (defendant must establish prejudice in absence from in-chambers conference). Appellant's counsel was present during both conferences and fully participated. Moreover, the conferences mostly involved legal issues within the professional competence of counsel, not issues that appellant must personally decide. See *United States v. Gagnon* (1985), 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (defendant's absence from an in-camera hearing involving a juror, where counsel was present, did not offend due process); see, also, *State v. White* (1998), 82 Ohio St.3d 16, 26, 693 N.E.2d 772 (defendant's absence during hearing on proposed jury instructions did not deny him a fair trial). Thus, proposition XIV is rejected.

{¶ 216} ***Defendant's shackling.*** In proposition of law XVII, appellant contends that he was denied a fair trial when the jury saw him shackled.

{¶ 217} After the jury had started guilt-phase deliberations, the jury returned to the courtroom for instructions prior to retiring for the evening. Appellant was placed in handcuffs while the jurors were leaving the courtroom. Although trial counsel acknowledged that the handcuffing was "inadvertent," the defense requested a mistrial. In overruling the motion for mistrial, the trial court stated that "Mr. McKnight has appeared throughout all stages of the proceedings, * * * whenever the jury has been present, * * * he has appeared in street clothing,

and he has appeared free of any restraints of any type, at least anything visible to the jury."

{¶ 218} Over defense objection, the trial court provided a curative instruction before the jury resumed its deliberations. The trial court advised the jury: "If you have seen Gregory B. McKnight in any type of restraints at any time during this proceeding, you are hereby instructed to disregard it, as it does not bear on his guilt or innocence in any manner."

{¶ 219} No one should be tried while shackled, absent unusual circumstances. *Illinois v. Allen* (1970), 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353.[1] Even though the jury saw appellant handcuffed on one occasion, appellant has failed to demonstrate prejudice. The jury's view of him was brief and inadvertent. Cf. *State v. Kidder* (1987), 32 Ohio St.3d 279, 285–286, 513 N.E.2d 311 (danger of prejudice is slight where a juror's view of defendant in custody is brief, inadvertent, and outside of the courtroom).

{¶ 220} Moreover, the trial court's curative instruction removed any prejudice. See *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (jury presumed to follow the trial court's curative instructions). Thus, the fact that the jury observed appellant handcuffed on one occasion did not deprive him of a fair trial. Accordingly, we find that proposition XVII lacks merit.

### Trial-phase instructions

{¶ 221} **1. Instructions on credibility.** In proposition of law IX, appellant argues that the trial court's preliminary instructions on credibility were improper. Trial counsel, however, failed to object and waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 222} During preliminary guilt-phase instructions, the court advised the jury: "The testimony of one witness believed by you is sufficient to prove any fact. *Also, discrepancies in a witness' testimony, or between his testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time.* You are certainly all aware of the fact that two persons who are witnesses to an incident may often see or hear it differently. In considering a discrepancy in witness testimony, you should consider whether such discrepancy concerns an important fact or a trivial one." (Emphasis added.) These preliminary instructions on credibility were not repeated during the closing instructions.

---

1. The jury viewed appellant during the guilt phase of the trial. Thus, *Allen,* which considered the use of visible shackles during the guilt phase of a criminal trial, is directly on point. The United States Supreme Court also has held that the Constitution forbids the use of visible shackles during the penalty phase of a criminal trial. *Deck v. Missouri* (2005), —— U.S. ——, 125 S.Ct. 2007, 161 L.Ed.2d 953.

{¶ 223} Crim.R. 30(B) permits the trial court to give cautionary jury instructions relating to credibility and weight of the evidence. The preliminary instructions clarified the jury's function in judging credibility and determining the weight to assign the testimony. Moreover, this instruction is virtually identical to instructions approved in *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 51–56. Thus, we find no plain error in these instructions.

{¶ 224} **2. Duplicative instructions.** In proposition of law XVIII, appellant argues that the instructions on the R.C. 2929.04(A)(3) escaping-detection specification and the separate kidnapping and aggravated-robbery charges were duplicative and violated his right to a unanimous jury verdict.

{¶ 225} Appellant's failure to object to the allegedly duplicative nature of the instructions waived all but plain error. *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Moreover, appellant's proposed instructions included language that he now contends was erroneous. Thus, appellant invited any error and may not " 'take advantage of an error which he himself invited or induced.' " *State v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484, quoting *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus; *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408.

{¶ 226} We reject appellant's claims on the basis of plain error and invited error. Instructions on the R.C. 2929.04(A)(3) specification referred to appellant's committing the murders for "the purpose of escaping detection, apprehension, trial or punishment for *kidnapping and/or a theft offense*." (Emphasis added.) Appellant argues that this instruction deprived him of his right to a unanimous jury verdict because some of the jurors may have convicted him of the (A)(3) specification on the basis of kidnapping and others on the basis of aggravated robbery. The jurors did not convict appellant of the (A)(3) specification on alternative theories, because the same jury separately convicted him of *both* kidnapping and aggravated robbery. Cf. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 68; *State v. Keene* (1998), 81 Ohio St.3d 646, 664, 693 N.E.2d 246. Thus, the outcome of appellant's case would not have been different had the instructions been worded differently.

{¶ 227} On the kidnapping charge, the jury was instructed to determine whether "McKnight, by force, threat or deception, *did remove Emily Murray* from the place where she was found or *restrain Emily Murray* of her liberty for the purpose of terrorizing or inflicting serious physical harm on Emily Murray." (Emphasis added.) On the aggravated-robbery charge, the jury was instructed to determine whether appellant "*knowingly obtained* or *exerted control* over the green Subaru Outback without the consent of the owner or person authorized to give consent or *by threat*." (Emphasis added.) Appellant argues that both sets

of instructions deprived him of a unanimous jury verdict because the jury was instructed on alternative means for committing these offenses.

{¶ 228} Neither the kidnapping nor the aggravated-robbery instructions were improper, because the alternatives were given to the jury disjunctively. *State v. Nields* (2001), 93 Ohio St.3d 6, 30, 752 N.E.2d 859; *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70. Jurors need not agree on a single means for committing these offenses. The United States Supreme Court has stated, " '[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' " *Schad v. Arizona* (1991), 501 U.S. 624, 631–632, 111 S.Ct. 2491, 115 L.Ed.2d 555, quoting *McKoy v. North Carolina* (1990), 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (Blackmun, J., concurring).

{¶ 229} Based on the foregoing, proposition XVIII is overruled.

{¶ 230} 3. **Instructions on release in a "safe place unharmed."** In proposition of law XX, appellant claims that the kidnapping instructions were flawed because of instructions on whether Murray was released "in a safe place unharmed."

{¶ 231} The indictment charging kidnapping included language that "the said Gregory B. McKnight did not release the said Emily S. Murray in a safe place unharmed." The trial court's guilt-phase instructions on kidnapping stated, "If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of kidnapping, your verdict must be guilty. You must then go on to decide whether Emily Murray was or was not released in a safe place unharmed."

{¶ 232} Although the defense did not object at trial, the defense's proposed instructions on kidnapping omitted the "released unharmed in a safe place" from its charge. Thus, the defense has preserved this issue. See *Brooks,* 75 Ohio St.3d at 160, 661 N.E.2d 1030; *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph one of the syllabus. Nevertheless, no prejudicial error was committed.

{¶ 233} Under R.C. 2905.01(C), the offense of kidnapping is generally a first-degree felony but may be reduced to a second-degree felony if "the offender releases the victim in a safe place unharmed." This provision, however, is not an element of the offense; rather, the defendant must plead and prove that assertion as an affirmative defense. *State v. Sanders,* 92 Ohio St.3d at 265, 750 N.E.2d 90; *State v. Cornute* (1979), 64 Ohio App.2d 199, 18 O.O.3d 152, 412 N.E.2d 416, syllabus. Appellant never argued that Murray was released unharmed in a safe place. Thus, the language was not properly at issue.

{¶ 234} Appellant argues that the instruction on release in a "safe place unharmed" was prejudicial, turning a mitigating circumstance into an aggravating element. That assertion, however, is speculative. Moreover, overwhelming evidence supported the jury's verdict on the kidnapping and murder charges. Consequently, appellant suffered no prejudice by the finding of the jury that Murray was not released "in a safe place unharmed." Thus, we overrule proposition XX.

{¶ 235} *Vagueness challenge.* In proposition of law XIX, appellant argues that the term "serious physical harm," as defined by R.C. 2901.01(A)(5)(e), is unconstitutionally vague on its face and unconstitutional as applied to him.

{¶ 236} The instructions on "serious physical harm" related to the felony-murder charge, the R.C. 2929.04(A)(7) kidnapping specification, and kidnapping. The trial court used the definition of "serious physical harm" set forth in R.C. 2901.01(A)(5)(b), (c), (d), and (e) in instructing the jury on "serious physical harm": " 'Serious physical harm to persons' means any physical harm that carries a substantial risk of death or any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary substantial incapacity, or any physical harm that involves some permanent disfigurement or that involves some temporary serious disfigurement or *any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.*" (Emphasis added.)

{¶ 237} Appellant argues that R.C. 2901.01(A)(5)(e) does not give fair notice to persons of ordinary intelligence that they might be guilty of kidnapping by causing "prolonged or intractable pain" to a victim. Although appellant did not challenge the statute as vague at trial, he argues that the error was not waived, because the defense submitted a set of properly worded jury instructions. See *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph one of the syllabus. The defense's proposed instructions did not define "serious physical harm," and thus the defense waived this issue absent plain error. *Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 44. There was no plain error.

{¶ 238} To withstand a claim of vagueness, a criminal statute must define a criminal offense with sufficient clarity for ordinary people to understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Akron v. Rowland* (1993), 67 Ohio St.3d 374, 381, 618 N.E.2d 138, citing *Grayned v. Rockford* (1972), 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222; see, also, *Papachristou v. Jacksonville* (1972), 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110.

{¶ 239} R.C. 2901.01(A)(5)(e) is not vague on its face, nor is it unconstitutional as applied to appellant. The statute provides a precisely worded definition of

"serious physical harm to persons" that a person of ordinary intelligence can understand. If a person inflicts "[a]ny physical harm that involves acute pain [that results] in substantial suffering or that involves any degree of prolonged * * * pain," that person has committed "serious physical harm." R.C. 2901.01(A)(5)(e). Further, the statute does not encourage arbitrary and discriminatory enforcement. *State v. Morris* (Nov. 13, 1986), Cuyahoga App. No. 51279, 1986 WL 12861, at *3–4 (ruling that the definition of "serious physical harm" was not constitutionally vague). Thus, we reject proposition XIX.

### Penalty-phase issues

{¶ 240} *Victim testimony for life sentence.* In proposition of law XXII, appellant argues that the trial court violated his constitutional rights by refusing to allow Murray's family members and friends to testify that he should receive a life sentence.

{¶ 241} Before the penalty phase, the defense requested a continuance to develop testimony that Murray's family members wanted appellant to receive a life sentence. An affidavit from Kathleen Murray, the victim's sister, requested a life sentence because of the family's following concerns: a death sentence would result in appeals that would continue to cause pain to the family, Emily would not have wanted appellant to receive the death penalty, and appellant should not receive the death penalty for the sake of his own children. In denying the defense motion, the trial court held that "the position of the victim's family as to the death penalty is not a relevant mitigating factor."

{¶ 242} Additional requests that appellant receive a life sentence were submitted to the trial court before sentencing and included a statement from the victim's parents and letters and e-mails from several of Murray's friends. The trial court did not consider these statements in sentencing appellant.

{¶ 243} First, appellant argues that proposed testimony from Murray's family members recommending that he receive a life sentence was linked to his "history" and "background" and therefore admissible under R.C. 2929.04(B). Such testimony had no bearing on appellant's history, character, or background. Similarly, sentencing recommendations from Murray's family members did not constitute relevant mitigation under R.C. 2929.04(B)(7), which encompasses "[a]ny other factors that are *relevant* to the issue of whether the offender should be sentenced to death." (Emphasis added.)

{¶ 244} Other jurisdictions that have considered the admissibility of sentencing recommendations opposing the death penalty from a victim's family members have reached the same conclusion. See, e.g., *Robison v. Maynard* (C.A.10, 1991), 943 F.2d 1216, 1217–1218 (opinion of victim's relative irrelevant to jury's determination of whether death penalty should be imposed); *Commonwealth v. Bomar* (2003), 573 Pa. 426, 460–461, 826 A.2d 831 (testimony of victim's mother opposing

the death penalty irrelevant to the defendant's character, record, or circumstances of the crime); *Ware v. State* (2000), 360 Md. 650, 691, 759 A.2d 764 (testimony that victim's family does not wish death sentence imposed has no bearing on defendant's character, prior record, or circumstances of the offense); *State v. Bowman* (1998), 349 N.C. 459, 478, 509 S.E.2d 428 ("conflicting feelings" of victim's mother regarding death penalty not relevant); *State v. Pirtle* (1995) 127 Wash.2d 628, 671, 904 P.2d 245 (victim's essay stating general opposition to death penalty inadmissible because it was not pertinent to extenuating circumstances or defendant's moral culpability).

{¶ 245} Furthermore, appellant's constitutional rights were not violated by the exclusion of testimony from Murray's family members recommending that appellant receive a life sentence. In *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, a plurality of the court held that a jury should "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis sic.) Id. at 604, 98 S.Ct. 2954, 57 L.Ed.2d 973. It noted, however, that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Id. at 605, 98 S.Ct. 2954, 57 L.Ed.2d 973, fn. 12. Here, possible testimony from Murray's family members recommending a life sentence had no relevance to appellant's character, prior record, or the circumstances of the offense.

{¶ 246} Second, appellant contends that the life-sentence recommendations from Murray's family were admissible as victim-impact testimony. This argument also lacks merit.

{¶ 247} In *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058, syllabus, this court held, "Expressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate the defendant's constitutional right to have the sentencing decision made by the jury and judge." Subsequently, the United States Supreme Court held, "[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne v. Tennessee* (1991), 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720, overruling *Booth v. Maryland* (1987), 482 U.S. 496, 507, 107 S.Ct. 2529, 96 L.Ed.2d 440 (victim-impact evidence inadmissible at sentencing phase of capital trial unless directly related to circumstances of crime), and *South Carolina v. Gathers* (1989), 490 U.S. 805, 811, 109 S.Ct. 2207, 104 L.Ed.2d 876 (extending *Booth* to prohibit prosecutor's statements regarding personal characteristics of victim). *Payne* did not reexamine the propriety of victims' families' recommendations as to the appropriate sentence or

sanction their admission. See *Payne,* 501 U.S. at 830, 111 S.Ct. 2597, 115 L.Ed.2d 720, fn. 2.

{¶ 248} Since *Payne,* this court has adhered to *Huertas* and "prohibited the admission of witnesses' opinions as to the appropriateness of a particular sentence." *Treesh,* 90 Ohio St.3d at 487, 739 N.E.2d 749; *State v. Franklin,* 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 88 (holding that a "victim's family may not recommend a sentence in a capital case"). Thus, the recommendations of the Murray family concerning the appropriate sentence were not admissible as victim-impact testimony.

{¶ 249} Finally, we find that the trial court did not err by failing to consider the recommendations from Murray's family and friends before imposing the death sentence. Cf. *Franklin,* 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 88 (sentencing recommendation from victim's family not reversible error unless the judge actually considered it in sentencing the defendant to death).

{¶ 250} Based on the foregoing, proposition XXII is overruled.

### *Penalty-phase instructions*

{¶ 251} **1. Instructions on "superaggravating" circumstance.** In proposition of law XXI, appellant argues that the instructions of the trial court improperly merged aggravating circumstances under R.C. 2929.04(A)(7) and 2929.04(A)(5) into one "superaggravating" circumstance.

{¶ 252} During preliminary penalty-phase instructions, the jury was advised that the R.C. 2929.04(A)(7) kidnapping and aggravated-robbery aggravating circumstances and the R.C. 2929.04(A)(5) course-of-conduct aggravating circumstance were recounted as a single aggravating circumstance.[2] The trial court later instructed the jury to consider the kidnapping, aggravated robbery, and course-of-conduct specifications as three separate aggravating circumstances.

{¶ 253} During final instructions, the jury was again instructed that there was a single aggravating circumstance: "In the first phase of this trial, you found Gregory B. McKnight guilty of one count of aggravated murder during the commission of kidnapping. You also found him guilty of specifications of aggravating circumstances. There were four of them, but to ensure that the weighing process is not influenced by mere numbers, the aggravating circumstances of which you found Gregory B. McKnight guilty have been merged into one aggravating circumstance. It is as follows: The aggravated murder was committed while Gregory B. McKnight was committing or attempting to commit or fleeing immediately after committing or attempting to commit kidnapping and

---

2. The R.C. 2929.04(A)(3) escaping-detection aggravating circumstance was merged into the R.C. 2929.04(A)(7) kidnapping and robbery aggravating circumstances.

aggravated robbery of Emily S. Murray and Gregory B. McKnight was the principal offender, and the aggravated murder was part of a course of conduct by Gregory B. McKnight involving killing two or more persons."

{¶ 254} R.C. 2929.03(D)(2) specifies that the jury shall recommend a sentence of death "[i]f the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors." Moreover, " 'the "aggravating circumstances" against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt.' " *Green*, 90 Ohio St.3d at 360–361, 738 N.E.2d 1208, quoting *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph one of the syllabus. Accord *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus.

{¶ 255} We find that the two R.C. 2929.04(A)(7) and the R.C. 2929.04(A)(5) aggravating circumstances were not duplicative, and they should not have been merged into a single aggravating circumstance, because the jury was obligated to "*separately* weigh the aggravating circumstances" of each count against the mitigating factors. (Emphasis added.) *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 96; see, also, *State v. Keith* (1997), 79 Ohio St.3d 514, 532, 684 N.E.2d 47.

{¶ 256} The error, however, was not prejudicial. Grouping the aggravating circumstances did not alter their substance. The trial court advised the jury that the aggravating circumstances were merged into a single aggravating circumstance "to ensure that the weighing process is not influenced by mere numbers." Cf. *State v. Smith* (1997), 80 Ohio St.3d 89, 115, 684 N.E.2d 668. Moreover, we have independently reevaluated the sentence and thereby rectify any error in the merger of the aggravating circumstances. *State v. Twyford*, 94 Ohio St.3d at 352, 763 N.E.2d 122; *Cook*, 65 Ohio St.3d at 527, 605 N.E.2d 70.

{¶ 257} Based on the foregoing, proposition XXI is rejected.

{¶ 258} **2. Instructions on mitigating factors and readmitted evidence.** In proposition of law XXIII, appellant alleges two errors in the penalty-phase instructions.

{¶ 259} First, appellant argues that the trial court erred by failing to instruct the jury that it did not have to unanimously find mitigating factors. See *Mills v. Maryland* (1988), 486 U.S. 367, 383, 108 S.Ct. 1860, 100 L.Ed.2d 384 (jury may not be instructed that it must unanimously agree on a mitigating factor before that factor may be weighed against an aggravating circumstance). Appellant did not request that the court instruct the jury that it need not unanimously find mitigating circumstances and thus waived all but plain error. Crim.R. 30(A);

*State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraphs one and two of the syllabus. Appellant cites no instructional language that "could reasonably be taken to require unanimity as to the presence of a mitigating factor." *Coe v. Bell* (C.A.6, 1998), 161 F.3d 320, 338. Because the jury was not so instructed, *Mills* was not violated. See *Sanders,* 92 Ohio St.3d at 268, 750 N.E.2d 90; *State v. Goff* (1998), 82 Ohio St.3d 123, 129, 694 N.E.2d 916. Thus, there was no plain error.

{¶ 260} Second, appellant contends that the trial court erred by readmitting all the guilt-phase evidence during the penalty phase and then advising the jury to "consider all of the testimony and evidence relevant to the aggravating circumstance Gregory B. McKnight was found guilty of committing." Appellant failed to object and waived all but plain error. See *Underwood,* 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 261} To the extent that the jury may have interpreted the instructions as allowing them to determine relevancy, the trial court erred. It is "the trial court's responsibility to determine the admissibility of evidence." *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866. Nevertheless, much of the guilt-phase evidence was relevant to the aggravating circumstances, the nature and circumstances of the offense, and the mitigating factors. Further, properly admitted evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating factors. See *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 208. Thus, we find that the trial court's misstatement did not result in plain error. Proposition XXIII is rejected.

{¶ 262} *Life-sentence options.* In proposition of law XXIV, appellant argues that the penalty-phase instructions and the language of the verdict forms improperly placed the burden of proof on the defense for the life-sentence options.

{¶ 263} The defense failed to object to these instructions and verdict forms and waived all but plain error. *Underwood,* 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Moreover, the defense-proposed jury instructions on the life-sentence options included language almost identical to that on the verdict forms. Appellant cannot complain, because he invited any error. *Bey,* 85 Ohio St.3d at 493, 709 N.E.2d 484; *Seiber,* 56 Ohio St.3d at 17, 564 N.E.2d 408.

{¶ 264} Additionally, there was no plain error. The trial court instructed the jury: "If all twelve of you find that the State of Ohio proved beyond a reasonable doubt * * * that the aggravating circumstance * * * is sufficient to outweigh the mitigating factors in this case, then it will be your duty to decide that the sentence of death shall be imposed on Gregory B. McKnight.

{¶ 265} "If you find that the State of Ohio has failed to prove beyond a reasonable doubt that the aggravating circumstance Gregory B. McKnight was

guilty of committing is sufficient to outweigh the mitigating facts present in this case, then it will be your duty to decide which of the * * * life sentence alternatives should be imposed[.] * * *

{¶ 266} "If the weight of the aggravating circumstance and mitigating factors are equal, then you must proceed to consider the life sentence alternatives. You are not required to unanimously find that the State failed to prove that the aggravating circumstance outweighs the mitigating factors before considering one of the life sentence alternatives."

{¶ 267} The language in the verdict forms tracked these instructions. The three verdict forms presenting life sentence options stated: "We, the jury, being duly impaneled and sworn, do hereby find that the aggravating circumstance that Gregory B. McKnight was found guilty of committing, does not outweigh the mitigating factors presented in this case by proof beyond a reasonable doubt." The verdict forms then provided the jury with the options of life imprisonment with parole, life imprisonment without the possibility of parole for 30 years, or life imprisonment without the possibility of parole for 25 years.

{¶ 268} The instructions and the language of the verdict forms for the life-sentence options did not place the burden of proof on the defense. When read as a whole, the instructions of the trial court and the language of the verdict forms effectively informed the jury that a death-penalty recommendation could be returned only after a unanimous vote that the aggravating circumstance out-weighed the mitigating factors beyond a reasonable doubt. See *State v. Davis* (1996), 76 Ohio St.3d 107, 117, 666 N.E.2d 1099. As to the life-sentence options, the instructions and the language of the verdict forms simply instructed the jury that it *must* decide among the life-sentence options *if* it found that the state had failed to prove that the aggravating circumstances outweighed the mitigating factors. See *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82. We reject proposition XXIV.

### *Prosecutorial misconduct*

{¶ 269} In proposition of law XXVII, appellant argues that the prosecutor committed misconduct by making prejudicial statements during both phases of the trial. The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14–15, 14 OBR 317, 470 N.E.2d 883. The touchstone for analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 270} *Victim-impact evidence and argument.* Appellant recasts his objections to victim-impact and character evidence into claims of prosecutorial misconduct. Specifically, appellant maintains that the prosecutor erred by presenting

testimony about Murray's character and the impact of her death on friends and family. He also argues that the prosecutor's opening statement and final argument commenting on the character and victim-impact evidence constituted prosecutorial misconduct. Appellant failed to object and waived all but plain error. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. As discussed earlier in proposition III, we conclude that the prosecutor's comments and presentation of testimony were not plain error.

{¶ 271} *Other-acts evidence.* First, appellant argues that the prosecutor committed misconduct by eliciting testimony that the police went to appellant's trailer to serve him with an indictment for burglary. Defense counsel failed to object and waived all but plain error. See *Wade,* 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 272} During direct examination, Vinton County Chief Deputy Sheriff Charles Boyer explained how Murray's car was found at appellant's trailer:

{¶ 273} "Q: Okay. Now, let's rewind a minute here. You talked to Matt Kight; you told him to return to a scene. What scene are we talking about?

{¶ 274} "A: On Clark Road, the McKnight residence.

{¶ 275} "Q: Okay. And the vehicle that you're talking about, tell us the circumstances surrounding why you were asking the deputy to go back and recheck this vehicle.

{¶ 276} "A: Well, * * * we had the indictment on Mr. McKnight on the burglary, he had made a statement about people from New York being involved—

{¶ 277} "Q: Okay, let me stop you there.

{¶ 278} " * * *

{¶ 279} "(Counsel approached the bench and the following proceedings were had out of the hearing of the jury:)

{¶ 280} "Mr. Canepa: With the Court's permission, I'd like to be able to advise Deputy Boyer to not discuss any further the burglary or the indictment. I've been trying to avoid it, but obviously—

{¶ 281} "Mr. Carson: I didn't object, because it just draws more attention to it * * *.

{¶ 282} "Mr. Canepa: Right. I'm going to advise him to stay away from that. At this juncture, if you can think of a curative instruction, I would not be opposed to that.

{¶ 283} "Mr. Carson: I think I would almost prefer to let it go, because I think it just draws more attention back to it."

{¶ 284} Boyer then finished testifying without any further reference to an indictment for burglary.

{¶ 285} There was no plain error. Boyer's reference to the uncharged burglary indictment was isolated and of relatively minor significance given the gravity of the offenses for which appellant was being tried. Moreover, the prosecutor took immediate steps to ensure that Boyer's inadvertent comments were not repeated. Cf. *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 161, 749 N.E.2d 226 (improper testimony about defendant's failure to pay child support was not plain error).

{¶ 286} Second, appellant argues that the prosecutor misbehaved by introducing testimony about appellant's marital infidelities and then referring to that testimony during closing argument. As discussed in proposition III, the testimony of appellant's co-workers Amber Hammers and Gloria Ressler helped establish appellant's plan by modus operandi evidence under Evid.R. 404(B). Testimony that appellant and Lisa Perkins had had sex in his car and that he spent evenings with Perkins at Dana Bostic's home was improper. Nevertheless, the error was harmless in view of the overwhelming evidence of appellant's guilt. See *State v. Williams* (1988), 38 Ohio St.3d 346, 351, 528 N.E.2d 910.

{¶ 287} Finally, appellant correctly points out that the prosecutor improperly introduced evidence of his reaction to the presence of the police. As discussed in proposition of law III, appellant's reaction to the police occurred *before* he murdered either Julious or Murray and thus was inadmissible. We find that the testimony was harmless error.

{¶ 288} *Guilt-phase argument.* Appellant argues that various aspects of the prosecutor's guilt-phase argument resulted in prosecutorial misconduct. The defense failed to object and waived all but plain error. See *Slagle,* 65 Ohio St.3d at 604–605, 605 N.E.2d 916.

{¶ 289} First, appellant asserts that the prosecutor acted improperly when he speculated about what was in Murray's mind. Testimony was introduced that Murray returned to her dorm room on the night she disappeared and got her keys. The prosecutor argued that this was for the purpose of "giving Greg a ride home to Met O Wood Lane in Gambier, not to Vinton County. That's what was in Emily's mind." This argument represented fair comment on the evidence and was not plain error.

{¶ 290} Second, appellant argues that the prosecutor's rebuttal improperly responded to defense arguments. During closing argument, trial counsel discussed the state's failure to test the DNA of blood found on the .357 Ruger that had belonged to Kimberly Zimmerman, the sister of Kathy McKnight. Counsel argued that even though "the gun was ruled out as the possible gun used in Emily Murray's case, why wouldn't [the police] check it for Julious?" According

to the defense, the failure to conduct DNA testing was "a colossal blunder, * * * a deliberate act, and it ought to make you sick."

{¶ 291} In rebuttal, the prosecutor reminded the jury, "This gun was tested ballistically. This gun was not the murder weapon that was held up to Emily Murray's head and shot through her skull." The prosecutor then argued, "How does this blow the whole case out of the water? It doesn't, not at all. This gun was at the Zimmermans' in May. 'Now, it wasn't tested, so that means that Kim Zimmerman did it, ha-ha.' Guess who else lived with the Zimmermans in May of 2000? This guy."

{¶ 292} The defense·opened the door to the prosecutor's rebuttal. The prosecutor's comment that the .357 Ruger was not linked to Murray's murder explained the absence of DNA testing of blood on the weapon. Furthermore, the prosecutor's statement that the failure to conduct DNA testing did not exculpate appellant as to the murder of Julious was not improper. This was fair comment in the face of the defense argument that the state's failure to conduct DNA testing was a "colossal blunder" and a "deliberate act." Moreover, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *State v. Smith* (1997), 80 Ohio St.3d 89, 111, 684 N.E.2d 668. Thus, we find no plain error.

{¶ 293} Third, appellant argues that the prosecutor misbehaved during his rebuttal argument by asking the jury, "Why didn't [the defense] present any witnesses?" According to appellant, the prosecutor's comment attempted to shift the burden of proof to the defense. The prosecutor may comment upon the failure of the defense to offer evidence in support of its case. *State v. Clemons* (1998), 82 Ohio St.3d 438, 452, 696 N.E.2d 1009; *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754. Moreover, "[s]uch comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent." *State v. Collins* (2000), 89 Ohio St.3d 524, 527–528, 733 N.E.2d 1118. Again, there was no plain error.

{¶ 294} *Penalty-phase opening statement.* Appellant argues that the prosecutor improperly informed the jury that the escaping-detection aggravating circumstance was one of the four aggravating circumstances for the jury's consideration on sentencing, despite the trial judge's ruling that this aggravating circumstance had merged with the others.

{¶ 295} During penalty-phase opening statement, the prosecutor advised the jury that there were four aggravating circumstances and that the R.C. 2929.04(A)(3) specification was one of the aggravating circumstances. Following a defense objection, the trial court informed the parties that the (A)(3) specification was duplicative of the (A)(7) specifications. The trial court then advised the

jury that the (A)(3) specification had been merged. Thereafter, the prosecutor avoided any reference to the (A)(3) specification as part of the aggravating circumstance.

{¶ 296} Nothing indicates that the prosecutor's isolated reference to the (A)(3) specification was intentional. See *State v. Waddy*, 63 Ohio St.3d at 436, 588 N.E.2d 819, quoting *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 646, 94 S.Ct. 1868, 40 L.Ed.2d 431 (" '[i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion[,] not of evidence, do not reach' the level of a due process violation"). Moreover, the trial court subsequently instructed the jury that the (A)(3) specification was merged. Thus there was no prejudicial error as the result of the prosecutor's comments.

{¶ 297} *Penalty-phase closing argument.* Appellant contends that the prosecutor also misbehaved by referring to him as a lying, cheating husband. Trial counsel's failure to object to the prosecutor's argument waived all but plain error. See *Slagle*, 65 Ohio St.3d at 604–605, 605 N.E.2d 916. There was no plain error.

{¶ 298} The prosecutor's closing argument did not present the theme that appellant was a lying and cheating husband. The prosecutor argued that appellant had failed to take responsibility for the health and welfare of his two children; however, the defense had opened the door to that argument after Copley testified during mitigation that appellant was "a very caring, loving father."

{¶ 299} Finally, we also reject appellant's argument that the prosecutor's cumulative misconduct prejudiced him. *Landrum*, 53 Ohio St.3d at 113, 559 N.E.2d 710. Based on the foregoing, we find that proposition XXVII lacks merit.

### Ineffective Assistance of Counsel

{¶ 300} In proposition of law XXVI, appellant raises numerous instances of alleged ineffective assistance of counsel during both phases of his trial. Reversal of a conviction for ineffective assistance of counsel "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 301} First, appellant complains that his counsel conducted inadequate voir dire of a prospective juror. " 'The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.' " *State v. Cornwell* (1999), 86 Ohio St.3d 560, 568, 715 N.E.2d 1144, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042.

{¶ 302} Appellant argues that counsel was deficient in failing to question Juror I–30 about her opinion regarding appellant's guilt after Juror I–30 indicated her belief, in the juror questionnaire, that appellant was guilty of the charged offenses. One question in the juror questionnaire asked, "Based on what you may have heard about this case, do you have an impression or opinion about what happened or who is responsible?" Juror I–30 answered "yes" and explained, "In the case of the death of the girl, I believe the body was found on his premises, although this does not mean he did it, it doesn't look good for him."

{¶ 303} Juror I–30's response on the questionnaire did not indicate that she had formed a preconceived belief of appellant's guilt. Moreover, Juror I–30 indicated that she had not formed an opinion about "who or what" caused the death of Julious or Murray in other responses on the questionnaire.

{¶ 304} Moreover, during the prosecutor's voir dire, Juror I–30 was asked whether she had formed any opinions about the case, and Juror I–30 answered, "Not necessarily. No." As noted in *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, defense counsel "need not repeat questions about topics already covered by * * * opposing counsel." Furthermore, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765. Thus, the defense counsel was neither remiss nor ineffective.

{¶ 305} Appellant raises other instances of alleged ineffectiveness of counsel, but none prejudiced him. As discussed in other propositions of law, appellant was not prejudiced by his counsel's failure to request the removal of an alleged sleeping juror (proposition XI), or by counsel's failure to request a *Remmer* hearing to explore allegations that a juror had discussed the case with his girlfriend (XIII). Furthermore, appellant was not prejudiced by his counsel's failure to request curative instructions following a courtroom outburst (XVI), or by his counsel's failure to object to prosecutorial misconduct (XXVII), gruesome photographs (XII), life-sentence options on the verdict forms (XXIV), or character and impact testimony about Murray (III). Appellant also suffered no prejudice from his counsel's failure to object to various guilt-phase (IX, XVIII, XX, and XXIX) and penalty-phase (XXIII and XXIX) instructions. Moreover, appellant was not prejudiced by his counsel's failure to request that evidence be stricken that related to appellant's marital infidelities or his reaction to the police prior to the date of the offenses (III).

{¶ 306} We also reject appellant's argument that his counsel was ineffective by waiving appellant's presence at in-chambers proceedings without consulting him. Appellant personally waived his presence at in-chambers proceedings, and this waiver was valid for the two in-chambers proceedings that he challenged (XIV).

{¶ 307} Finally, appellant argues that the cumulative effect of his counsel's ineffectiveness necessitates reversal. Appellant received a fair trial, and any error was nonprejudicial. See *Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 123. None of appellant's claims establish ineffective assistance of counsel, and proposition XXVI is overruled.

### Settled Issues

{¶ 308} *Reasonable doubt.* In proposition of law XXIX, appellant challenges the constitutionality of the instructions on reasonable doubt during both phases of the trial. We have previously rejected similar arguments and summarily overrule them here. See *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163.

{¶ 309} *Constitutionality.* In proposition of law XXX, appellant attacks the constitutionality of Ohio's death-penalty statutes. This claim has also been resolved. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 310} Appellant also argues that Ohio's death-penalty statutes violate international agreements to which the United States is a party. We also reject this argument. *Bey*, 85 Ohio St.3d at 502, 709 N.E.2d 484; *Phillips*, 74 Ohio St.3d at 103–104, 656 N.E.2d 643.

### Sentencing Opinion

{¶ 311} In proposition of law XXV, appellant asserts that there are numerous flaws in the sentencing opinion of the trial court.

{¶ 312} First, appellant argues that the sentencing opinion of the trial court improperly considered the kidnapping and aggravated-robbery aggravating circumstances, R.C. 2929.04(A)(7), and the course-of-conduct aggravating circumstance, R.C. 2929.04(A)(5), as one "superaggravating" circumstance. As discussed earlier in proposition XXI, the trial court erred by combining the two nonduplicative aggravating circumstances into a single aggravating circumstance. We have independently reevaluated the sentence and rectified this error in our sentencing evaluation. See *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124; *State v. Lott*, 51 Ohio St.3d at 170, 555 N.E.2d 293.

{¶ 313} Second, appellant contends that the trial court considered the following nonstatutory aggravating circumstances as aggravating factors: his use of a firearm, his failure to release Murray in a "safe place and unharmed," and his concealment of Murray's body "such that Emily remained missing for 36 days." We reject this argument because "[u]nder R.C. 2929.03(F), a trial court * * * may rely upon and cite the nature and circumstances of the offense as reasons

supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus; see, also, *Dickerson,* 45 Ohio St.3d at 212, 543 N.E.2d 1250.

{¶ 314} Third, appellant asserts that the trial court improperly considered the "intentional killing" of Murray during a kidnapping. The trial court could properly refer to the "intentional killing" of Murray in discussing the R.C. 2929.04(A)(7) aggravating circumstance because intent is an element of the underlying felony murder. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 345, 738 N.E.2d 1178.

{¶ 315} Finally, appellant argues that the trial court misconstrued the mitigating factors as evidence offered to reduce his culpability for the crimes. "Mitigating factors under R.C. 2929.04(B) are not necessarily related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, paragraph one of the syllabus.

{¶ 316} The sentencing opinion thoroughly discussed the mitigating evidence in appellant's case. The trial court also properly stated that the "aggravating circumstance must * * * be weighed against the mitigating factors about the individual which would weigh in favor of a decision that a life imprisonment sentence is the appropriate sentence." Thus, the trial court used the proper standard in weighing the aggravating circumstance against the mitigating factors. Nevertheless, the trial court improperly concluded that "the mitigating factors * * * have very little effect in minimizing, lessening or excusing the degree of the Defendant's murderous conduct." Again, we have independently reevaluated the sentence and rectified this error in the sentencing opinion. *Fox,* 69 Ohio St.3d at 191, 631 N.E.2d 124.

{¶ 317} Based on the foregoing, we find that proposition XXV lacks merit.

### *Cumulative Errors*

{¶ 318} In proposition of law IV, appellant argues that cumulative trial errors deprived him of a fair trial and mandate a reversal of his death sentence. We conclude that appellant received a fair trial and fair sentencing determination and that no significant cumulative error occurred. We reject proposition IV.

### *Weighing the Evidence and Proportionality*

{¶ 319} In proposition of law XXVIII, appellant argues that the death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. He also argues that the death penalty is disproportionate when his case is compared to similar cases in which the death penalty has been

148

imposed. We will consider these arguments during our independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

{¶ 320} Having considered appellant's propositions of law, as required by R.C. 2929.05(A), we now independently review appellant's death sentence for appropriateness and proportionality. The evidence established beyond a reasonable doubt that appellant was properly convicted of a course of conduct in killing Murray and Julious and murder while committing or attempting to commit kidnapping and aggravated robbery. R.C. 2929.04(A)(5) and (A)(7).

{¶ 321} Against these aggravating circumstances, we now weigh the mitigating factors contained in R.C. 2929.04(B). Appellant called two mitigation witnesses but did not make a statement on his own behalf.

{¶ 322} Kathy McKnight, the defendant's wife, testified that she and appellant were married on May 22, 1998. Appellant has supported his family through a variety of jobs "from selling cars to being a delivery person."

{¶ 323} The McKnights have two small children, Kachina and Keena. Appellant has a "great relationship" with his children and calls them his little prince and little princess. Appellant's children visited appellant in jail whenever they could. According to Kathy, their daughter "beams for days after going to see daddy, and every time [they] get into the car, she wants to know if [they're] going to see daddy again."

{¶ 324} Emma Copley, the defendant's mother-in-law, described appellant as "a very caring, loving father" to the children. Appellant "plays with them * * * [and has] taken them to carnivals and that sort of thing, a very loving, trusting father."

{¶ 325} Appellant and Kathy moved to Gambier to take care of Copley when she was having medical problems. Copley said that appellant was "very supportive, very helpful, always there." On one occasion, appellant kissed Copley on the forehead while she was in the hospital for some tests. Copley stated that "that proves what a caring, loving son-in-law he has been."

{¶ 326} In proposition of law XXVIII, appellant argues that his "support for and devotion to family, the love and support of his family members, his age, and his employment history are significant and should be given considerable weight."

{¶ 327} We find nothing in the nature and circumstances of the offenses to be mitigating. Appellant kidnapped Murray, stole her car, and then brutally murdered Murray inside his trailer. Murray's murder was part of a course of conduct during which appellant had previously murdered Julious.

{¶ 328} Appellant's history and background provide some mitigating features. Appellant has a loving family. Appellant's employment history also shows that he held several jobs.

{¶ 329} We find that the following statutory mitigating factors are inapplicable: R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); and (B)(6) (not principal offender). Appellant does not assert the R.C. 2929.04(B)(5) (lack of a significant criminal record) mitigating factor, nor is there any evidence that the (B)(5) mitigating factor applies.

{¶ 330} We find that the R.C. 2929.04(B)(4) mitigating factor (youth of the offender) is applicable but entitled to little weight because appellant was 23 years of age at the time of the offenses. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 197; *Hartman*, 93 Ohio St.3d at 306, 754 N.E.2d 1150.

{¶ 331} We also conclude that little weight should be given to mitigating factors under R.C. 2929.04(B)(7) (other relevant factors). The evidence includes testimony that appellant was a good father and has the support of a loving family. We also give little weight, if any, to appellant's brief employment history. The evidence does not suggest any other (B)(7) mitigating factors.

{¶ 332} The trial court properly merged the (A)(3) aggravating circumstance with the (A)(7) aggravating circumstances prior to sentencing. The trial court erred by merging the two separate (A)(7) aggravating circumstances into a single aggravating circumstance.

{¶ 333} Upon independent weighing, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Appellant's family history and his brief employment record are entitled to some consideration. These factors, however, are outweighed by the aggravating circumstances of appellant's course of conduct in killing Murray and Julious and his kidnapping of Murray and the robbery of her car. Therefore, we find that the death sentence in this case is appropriate.

{¶ 334} Finally, we find that the death penalty is proportionate to death sentences approved in similar cases. For other course-of-conduct murders, see *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182; *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 130; *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 145. For kidnapping murders, see *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 204; *Hartman*, 93 Ohio St.3d at 306, 754 N.E.2d 1150; *State v. Ballew* (1996), 76 Ohio St.3d 244, 258, 667 N.E.2d 369. For aggravated-robbery murders, see *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 109; *State v. Jackson* (2001), 92 Ohio St.3d 436, 453, 751 N.E.2d 946; *State v. Stallings* (2000), 89 Ohio St.3d 280, 301, 731 N.E.2d 159.

150

{¶ 335} Accordingly, appellant's convictions and sentences, including the sentence of death, are affirmed.

Judgment affirmed.

Lundberg Stratton, O'Connor and O'Donnell, JJ., concur.

Moyer, C.J., and Lanzinger, J., concur in part and dissent in part.

Pfeifer, J., concurs in part and dissents in part.

---

**Moyer, C.J., concurring in part and dissenting in part.**

{¶ 336} I concur in the decision of the majority to affirm the murder convictions and the sentence of death. I disagree with the determination of the majority that sufficient evidence exists to convict McKnight for a course-of-conduct specification pursuant to R.C. 2929.04(A)(5).

{¶ 337} I agree that the passage of five and one-half months between the two murders does not necessarily invalidate the course-of-conduct conviction. Nevertheless, " '[t]he further apart the acts are temporally, the more incumbent it is upon a court to carefully consider other factors * * * in determining whether the acts * * * are part of a course of conduct.' " *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 56, quoting *State v. Cummings* (1992), 332 N.C. 487, 510, 422 S.E.2d 692. Because a significant period of time elapsed between the two murders, evidence of "other factors," such as modus operandi and motive, must exist.

{¶ 338} No distinctive modus operandi linked the murders of Murray and Julious. Both Murray and Julious were shot in the head, and their bodies were disposed of on McKnight's remote homesite; however, no other " 'pattern or psychological thread * * * ties [the offenses] together.' " Id. at ¶ 52, quoting *Cummings*, 332 N.C. at 510, 422 S.E.2d 692. By way of comparison, in *Sapp*, each of the victims was raped and left nude from the waist down, and the victims' pants were cut open in a distinctive way. Id. at ¶ 59.

{¶ 339} Moreover, no evidence of a common motive links the murders of Murray and Julious. Murray was murdered as part of a kidnapping and robbery. There is no evidence that Julious's murder was motivated by similar secondary crimes. In contrast, in *Sapp*, there was a common motive linking the murders. Sapp murdered each victim to gratify his recurring "taste for blood." Id. at ¶ 60. Furthermore, Sapp murdered his victims after he perceived that they had each provoked him. Id.

{¶ 340} Though similarities exist between the two murders, there was no common scheme or pattern that tied the aggravated murders of Julious and Murray together. For these reasons, I would reverse the judgment of the court

of common pleas and vacate McKnight's conviction for a course-of-conduct specification. I concur in the remainder of the majority opinion, which affirms the convictions for murder and the sentence of death.

LANZINGER, J., concurs in the foregoing opinion.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 341} That Gregory McKnight killed Gregory Julious and Emily Murray was proved at trial beyond a reasonable doubt. I concur in upholding both murder convictions. I also join the Chief Justice's separate opinion, which explains why the two murders were not part of a course of conduct. I write separately because the record does not contain proof beyond a reasonable doubt that McKnight kidnapped Murray or that he committed aggravated robbery.

{¶ 342} The majority states, "The state proved that [McKnight] kidnapped Murray by showing that Murray and [McKnight] left work at approximately the same time on the night Murray disappeared, that Murray's car was found parked behind [McKnight's] trailer, and that Murray's murdered body was found rolled in a carpet inside [McKnight's] trailer." None of this evidence proves beyond a reasonable doubt that McKnight "by force, threat, or deception * * * remove[d] Murray] from the place where [she was] found or restrain[ed her] liberty." R.C. 2905.01(A). The majority also states that "the evidence proved that Murray did not have her wallet, driver's license, and credit cards when she disappeared and that Murray did not tell anyone she was leaving the area, despite her habit of informing friends of her whereabouts." But this evidence doesn't prove "force, threat, or deception." Further, this evidence suggests that Murray may have voluntarily given McKnight a ride home, as his co-workers sometimes did. (The record does not indicate that McKnight's co-workers ever gave him a ride to Vinton County.) As further proof of kidnapping, the majority states that "[McKnight] lied when Murray's friend asked about her, and [McKnight] also told a co-worker that she was 'probably dead.'" This evidence suggests nothing as to kidnapping; it is certainly damning evidence, but only as to murder. Finally, as further proof of kidnapping, the majority states, "[McKnight] also falsely told Kimberly Zimmerman that the Subaru behind his trailer belonged to his boss or a friend, 'and they were down there probably hunting.'" Again, this evidence suggests nothing as to kidnapping.

{¶ 343} "Other acts" testimony was admitted into evidence to prove McKnight's motive, opportunity, intent or purpose or plan to commit kidnapping. The evidence established that McKnight often needed a ride home from work and that he had a penchant for seeking extramarital sex. Calling these behavioral patterns a "modus operandi" is a significant stretch. This evidence should have been excluded because "its probative value is substantially outweighed by the

danger of unfair prejudice." Evid.R. 403(A). The evidence offers little to no probative value given the overwhelming evidence of murder and the absence of evidence of kidnapping. Further, the prejudicial effect is significant because of the opprobrium that a jury is likely to feel toward a serial adulterer, instructions to the contrary notwithstanding. That McKnight sought lovers seems a thin reed on which to base a kidnapping conviction.

{¶ 344} The majority discusses kidnapping only in the context of the sufficiency of the evidence. I agree that there is sufficient evidence to crest that low threshold. Affirming a death specification, however, requires proof beyond a reasonable doubt, which the record does not contain.

{¶ 345} While it ignores the consequences of the paucity of evidence to support a kidnapping conviction, at least the majority discusses it. The aggravated-robbery death specification was affirmed even though the majority opinion does not discuss any of the evidence on which it relies. Apparently, the mere presence of the Subaru on McKnight's property is sufficient evidence to prove that he stole it. In reality, the Subaru's presence on his property proves nothing more than its presence.

{¶ 346} The majority opinion concludes, "[McKnight] kidnapped Murray, stole her car, and then brutally murdered Murray inside his trailer." As discussed above, there is no evidence beyond a reasonable doubt that McKnight kidnapped Murray or that he stole her car. Based on the evidence in the record, it is as likely that Murray voluntarily drove McKnight home and voluntarily entered his home. Sadly, there is no doubt that McKnight committed a brutal murder. Nevertheless, because of the lack of evidence of the aggravating circumstances, McKnight should not be sentenced to death, and I dissent from the portion of the majority opinion that upholds the death sentence.

---

David H. Bodiker, Ohio Public Defender, and Joseph E. Wilhelm, Kelly L. Culshaw, and Robert K. Lowe, Assistant Public Defenders, for appellant.