DECISION.
 I. Facts and Procedure {¶ 1} After the trial court overruled his motion to suppress, defendant-appellant, Jamal Hampton, pleaded no contest to possession of cocaine under R.C. 2925.11(A). The trial court found him guilty and sentenced him to four years' imprisonment. He has filed a timely appeal from that conviction. We affirm the court's finding of guilt, but reverse the sentence imposed and remand the case for resentencing.
 {¶ 2} The record shows that Officer William Crock of the Regional Enforcement Narcotics Unit sought a warrant to search Hampton's residence. In the affidavit in support of the warrant, he described his years of experience as a narcotics investigator. He stated that he was "familiar with the methods utilized by narcotics traffickers to prepare, transport, ship and distribute illegal narcotics into the community, as well as methods used to avoid both detection by law enforcement and the loss of assets obtained from trafficking narcotics."
 {¶ 3} The affidavit went on to state that a reliable confidential informant had informed law enforcement that Hampton had purchased 16 ounces of inositol, which is a legal vitamin B supplement, at a particular store. Also, police officers had seen Hampton and a female companion enter the same store and leave carrying a white bag, which Hampton placed in the trunk of his car.
 {¶ 4} The affidavit further provided that "[i]nositol is a substance known by your affiant and brother RENU agents, commonly used as an adulterant for `cutting' cocaine. Your Affiant was provided information from brother officers that the DEA *Page 3 
lab located in Chicago reports that a very large amount of cocaine submissions analyzed contain adulterants such as [i]nositol. This is an inexpensive method for large drug traffickers to increase the size of cocaine with little to no physical alteration. According to the manufacturers of [i]nositol, a single serving consists of a quarter teaspoon a day. The 16 ounces of [i]nositol purchased on today's date * * * would last approximately 760 days. The distributors of [i]nositol advised that other supplements are available that perform the same as [i]nositol and cost much less and in some cases produce additional supplements to the body. Your Affiant, has, in the past three years, investigated numerous individuals purchasing large amounts of [i]nositol. It has been your Affiant's experience that in 100% of the time, these individuals have been involved in using [i]nositol as a cutting agent for cocaine, or buying the [i]nositol for other individuals who in turn were using it to `cut' cocaine. * * * Your Affiant knows that through years of investigating individuals purchasing large amounts of [i]nositol, none were for legitimate purposes."
 {¶ 5} Based on this affidavit, a judge issued the warrant. A search of Hampton's residence produced 597 grams of cocaine, a gun, and a scale.
 {¶ 6} Hampton presented the affidavit and testimony of Harry B. Plotnick, Ph.D., J.D., an expert in forensic toxicology. He stated that inositol was a food supplement generally available at health-food stores, pharmacies, and nutrition-supply stores. He also stated that "[t]here is no generally accepted dosage of inositol." He noted that one supplier recommended a dosage of 600 milligrams once or twice a day for its product known as "Inositol Powder." He went on to state that "[t]here are references in literature suggesting doses of inositol as high as 12 grams per day for diabetic retinopathy and depression." *Page 4 
 {¶ 7} Thus, he stated, one pound of powdered inositol was equivalent to 454 grams. That pound, used at a rate of 1,200 milligrams per day (2 doses of 600 milligrams) would last 378 days. A pound of inositol powder used at 12 grams per day would last about 37 days.
 {¶ 8} Plotnick also identified a 12-ounce bottle of inositol, which indicated that the powder could be taken up to three times daily. He stated that that bottle could last as long as 340 days or as little as 113.3 days, depending on how many times the powder was taken daily.
 {¶ 9} Crock testified that he had received information about inositol from another police officer. That officer had, in turn, received information from the Drug Enforcement Administration and other sources. The officers testified that they knew that inositol had legitimate uses, although they were unaware of some of the uses that came up at the hearing. Crock stated that in "the majority of cocaine cases," he and other officers had found inositol when executing search warrants.
 {¶ 10} The trial court held that the warrant was not supported by probable cause. Nevertheless, it found that the police officers' reliance on the warrant was objectively reasonable and that they had not intentionally misled the judge who issued the warrant. Therefore, it concluded that the good-faith exception applied, and it overruled Hampton's motion to suppress.
 II. The Search Warrant {¶ 11} Hampton presents two assignments of error for review. In his first assignment of error, he contends that the trial court erred in overruling his motion to suppress. He argues that the search warrant was not supported by probable cause and that the affidavit contained false and misleading statements. He also argues that *Page 5 
the officers' reliance on the warrant was not objectively reasonable, and, therefore, that the good-faith exception did not apply. This assignment of error is not well taken.
 {¶ 12} Appellate review of a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard.[1]
 A. False and Misleading Statements {¶ 13} We first address Hampton's argument that the affidavit contained false and misleading statements. An affidavit supporting a search warrant enjoys a presumption of validity.[2] To successfully attack the veracity of a warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement either "intentionally or with a reckless disregard for the truth."[3]
"Reckless disregard" means that the affiant had serious doubts about an allegation's truth.[4]
 {¶ 14} We find no statement in the affidavit that is materially false or misleading. Further, competent, credible evidence supported the trial court's finding that Crock had not made a false statement intentionally or with reckless disregard for the truth. The relevant facts were that Hampton had purchased what police believed to be a large amount of inositol, which, in the officers' experience, was frequently *Page 6 
used to cut cocaine. The officers did not need to have expert medical knowledge, and the fact that their math as to the dosages was not exact was not determinative.
 {¶ 15} Hampton argues that the affidavit was false and misleading because Crock stated in the affidavit that, in his experience, "100% of the time" individuals purchasing large amounts of inositol "have been involved in using the [i]nositol as a cutting agent for cocaine, or buying the [i]nositol for other individuals who in turn were using it to `cut' cocaine." But Crock testified at the hearing that "in a majority of the cocaine cases we find inositol in search warrants." Our review of the record shows different contexts for the statements. In the warrant, Crock referred to investigations of individuals who had purchased inositol. At the hearing, he was referring to all cases involving cocaine. Consequently, the statements were not inconsistent, and the discrepancy between them does not show that the affidavit was false and misleading.
 B. Probable Cause {¶ 16} When determining whether probable cause existed to support the issuance of a search warrant, a reviewing court must accord great deference to the issuing magistrate's probable-cause determination. Our duty is to ensure that the issuing magistrate had a substantial basis for concluding that probable cause existed.[5] Probable cause exists when an affidavit contains sufficient information to allow a magistrate to conclude that a "fair probability" exists that contraband or evidence will be found in the place to be searched.[6] *Page 7 
 {¶ 17} In this case, the affidavit stated (1) that Hampton had purchased one bottle of inositol, a legal product, (2) that police considered it to be a large amount of inositol, and (3) that inositol was often used to cut cocaine. These facts were not sufficient to establish probable cause. The affidavit did not show a nexus between Hampton's action and any illegal activity and did not establish a fair probability that contraband or evidence would be found at his residence.[7]
 C. Good-Faith Exception {¶ 18} The trial court did not suppress the evidence seized as a result of the search warrant because it found that the police officers had acted in good faith. The United States Supreme Court recognized the good-faith exception to the exclusionary rule in United States v.Leon.[8] It held that the exclusionary rule should not be applied to suppress evidence that police officers have obtained acting in objectively reasonable, good-faith reliance on a search warrant issued by a neutral and detached magistrate but ultimately found to be invalid.[9]
 {¶ 19} The good-faith exception to the exclusionary rule applies unless one of the following exceptions is present: (1) the magistrate or judge has been misled by false information that the affiant knew or should have known was false; (2) the issuing magistrate or judge has abandoned the judicial role; (3) the police have relied on a warrant based on an affidavit so lacking indicia of probable cause that no official could reasonably believe in its existence; or (4) the warrant is so fatally deficient that the officers executing it cannot reasonably presume that it is valid.[10] *Page 8 
 {¶ 20} Hampton contends that three of these exceptions applied in this case. We have already rejected his argument that the affidavit contained false information. He further argues that the affidavit so lacked indicia of probable cause that the officers could not reasonably have believed that probable cause existed and that the warrant was so fatally deficient that the officers could not reasonably have presumed that it was valid.
 {¶ 21} When they sought the warrant, the officers believed that little reason existed for purchasing what they believed to be a large amount of inositol other than the cutting of cocaine. In their experience, they had never seen a large quantity of inositol used for any other purpose than cutting cocaine. They did not have or need to possess the expertise of a toxicologist as to its dosages and uses. Even though inositol has legal uses, the purchase of a large amount threw up a red flag that at least required further investigation, although it did not provide probable cause for the warrant.
 {¶ 22} Thus, the record shows that the officers' reliance on the warrant was not so objectively unreasonable that the good-faith exception did not apply. Consequently, the trial court did not err in overruling Hampton's motion to suppress. But now that the police are on notice of the number of legal uses of inositol and the variations in dosages, the good-faith exception will not apply in the future. With that caveat, we overrule Hampton's first assignment of error.
 III. Post-Release Control {¶ 23} In his second assignment of error, Hampton contends that the trial court erred by not advising him of post-release-control sanctions at the sentencing hearing. We agree. The state argues that since the court advised Hampton about *Page 9 
post-release control at the plea hearing, no error occurred. But the Ohio Supreme Court has plainly stated that the trial court must inform the defendant about post-release control at the sentencing hearing.[11]
 {¶ 24} When the trial court fails to notify a defendant that he is subject to post-release control at the sentencing hearing, the sentence is void.[12] Consequently, we sustain Hampton's second assignment of error, vacate his sentence, and remand the case for a new sentencing hearing.[13]
Judgment affirmed in part, sentence vacated and cause remanded.
SUNDERMANN, P.J., and CUNNINGHAM, J., concur.
[1] State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372,797 N.E.2d 71, ¶ 8; State v. Taylor, 174 Ohio App.3d 477, 2007-Ohio-7066,882 N.E.2d 945, ¶ 11.
[2] State v. Roberts (1980), 62 Ohio St.2d 170, 178, 405 N.E.2d 247;Taylor, supra, at ¶ 12.
[3] Franks v. Delaware (1978), 438 U.S. 154, 155-156, 98 S.Ct. 2674;State v. Waddy (1992), 63 Ohio St.3d 424, 441, 588 N.E.2d 819;Taylor, supra, at ¶ 12.
[4] State v. McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046,837 N.E.2d 315, ¶ 31; Taylor, supra, at ¶ 12.
[5] State v. George (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph two of the syllabus; State v. Lee, 1st Dist. No. C-070056, 2008-Ohio-3157, ¶ 7.
[6] George, supra, at paragraph one of the syllabus; State v.Andrews, 171 Ohio App.3d 332, 2007-Ohio-2013, 870 N.E.2d 775, ¶ 100.
[7] See United States v. Salome (Sept. 7, 1994), D.Kan. No. 94-10049-01.
[8] (1984), 468 U.S. 897, 104 S.Ct. 3405.
[9] State v. Wilmoth (1986), 22 Ohio St.3d 251, 490 N.E.2d 1236, paragraph one of the syllabus; Andrews, supra, at ¶ 108.
[10] George, supra, at 331; Andrews, supra, at ¶ 109.
[11] State v. Jordan, 104 Ohio St.3d 21, 2004-Ohio-6085,817 N.E.2d 864, ¶ 11-21; State v. Martin, 1st Dist. No. C-070017,2007-Ohio-6662, ¶ 8; State v. Harris, 160 Ohio App.3d 851,2005-Ohio-2503, 828 N.E.2d 1086, ¶ 12-18.
[12] State v. Bezak, 114 Ohio St.3d 94, 2007-Ohio-3250,868 N.E.2d 961, ¶ 16; Martin, supra, at ¶ 8.
[13] Bezak, supra, at ¶ 16; Martin, supra, at ¶ 11. *Page 1